**LINCOLN SAV. BANK OF BROOKLYN v.
BROWN, Price Administrator.**
No. 12.

United States Emergency Court of Appeals.
Argued March 24, 1943.
Decided May 7, 1943.

Frederick Weisbrod, of Brooklyn, N. Y., for complainant.

Robert W. Ginnane, Atty., David Ginsburg, Gen. Counsel, Thomas I. Emerson, Associate Gen. Counsel, Nathaniel L. Nathanson, Asst. Gen. Counsel, and Benjamin Chapman, Atty., all of the Office of Price Administration, of Washington, D. C., for respondent.

Before VINSON, Chief Judge, and MARIS and MAGRUDER, Judges.

VINSON, Chief Judge.

This complaint, filed after the denial of a protest by the Price Administrator, involves a dual inquiry. Complainant maintains that the Emergency Price Control Act of 1942 [1] (the Price Act) does not authorize the regulation of its safe deposit box rentals, or, if it does, that the regulations promulgated thereunder do not subject these rentals to regulation.

Complainant is a banking corporation organized and existing under the laws of the State of New York. It maintains safe deposit departments in four of its five offices in Brooklyn, renting safe deposit facilities only to its savings account depositors, and limiting, in its written contract for the service, the articles which may be stored therein to "securities, jewelry and valuable papers only", in accordance with the provisions of Section 234 of the Banking Law of the State of New York. Consol.Laws, N.Y.C. 2.[2]

The Price Act is a breath-taking legislative departure from our peacetime economic policy. In Section 1(a) Congress embodied, at length, the broad scope and purposes of this wartime expedient.[3] Section 2(a), as partially set out below, vests authority in the Price Administrator to effect those enumerated purposes: "Whenever in the judgment of the Price Administrator (provided for in section 201) the price or prices of a commodity or commodities have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act, he may by regulation or order establish such maximum price or maximum prices as in his judgment will be generally fair and equitable * * *."

Section 302(c) is definitive: "The term 'commodity' means commodities, articles, products, and materials * * *, *and it also includes services rendered * * * in connection with the* processing, distribution, *storage,* installation, repair, or negotiation of purchases or sales *of a commodity,* or in connection with the operation of any service establishment for the servicing of a commodity: [exclusions not relevant here]." [Italics supplied.]

We believe the pertinent language in Section 302(c) is commendably precise. Congress not only indicated af-

---

[1] Act of January 30, 1942, 56 Stat. 23, as amended by the Act of October 2, 1942, 56 Stat. 765, 50 U.S.C.A. Appendix § 901 et seq.

[2] Subsection 9.

[3] "It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war, and the purposes of this Act are, to stabilize prices and to prevent speculative, unwarranted and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; to stabilize agricultural prices in the manner provided in section 3; and to permit voluntary cooperation between the Government and producers, processors, and others to accomplish the aforesaid purposes. * * *"

firmatively the wide area subject to price control, but it also detailed by specific exceptions those areas to which the authority of the Price Administrator could not extend.[4] Congress did not interject the term "commodity" in naked form, leaving it to be clothed with its customary connotation by those charged with construing the Price Act. The garb of "commodity" in its present role is definitely prescribed, and a number of new and unusual garments are included. "Commodity" is defined to mean, *inter alia,* "commodities, articles, products, and materials * * *." This is an extremely broad definition encompassing, we believe, all things possessing the attribute of tangible existence, i. e., all space-displacing objects, which are the subject of barter, transfer, sale, or other transactions involving the exchange of money or other value. But Congress did not stop here; it stated that the term as used in the Price Act should also include "services rendered * * * in connection with the * * * storage * * * of a commodity, or in connection with the operation of any service establishment for the servicing of a commodity * * *." Section 302(c) thus expresses an unequivocal Congressional intent that storage services rendered in connection with any articles, products, or materials not specifically exempted were intended to be subject to the Price Administrator's control. With this comprehensive statutory concept of "commodity" in mind, we will proceed to determine whether it applies to the services available to complainant's customers in connection with the storage of the three types of articles described.

It is conceded by the complainant that jewelry is a commodity. Securities and valuable papers must be considered commodities within the meaning of the Price Act as well as in general usage. They have heretofore been so designated by the courts.[5] Generally these articles have a substantial intrinsic value in addition to the valuable intangible interest which they represent. With such instruments as bonds payable to bearer, or other types of negotiable paper, intrinsic value may represent total value. In other securities and valuable papers there is, at the least, an intrinsic value representing difficulties of identification, cost and inconvenience of duplication, notary and registry fees, etc. The use of safe deposit facilities to preserve and protect securities is common knowledge. A valuable service is rendered to depositors by the arrangement of facilities for the safekeeping of these commodities.

The remaining aspect of the inquiry relating to Congressional authorization is whether the storing of these three commodities in safe deposit vaults is "storage" as that term is used in the Price Act. We feel that both in its natural significance and its use by the courts, "storage" must be taken to include services of the character involved in this controversy. Certainly the complainant may be said to be engaged in "the safekeeping of goods in a warehouse *or other depository,"* [Italics supplied] which, according to Webster, constitutes "storage".[6] In a New Jersey case,[7] the court was concerned with a statute which defined a warehouseman to mean a person lawfully engaged in the

---

[4] As contained in Section 302(c): " * * * (except materials furnished for publication by any press association or feature service, books, magazines, motion pictures, periodicals and newspapers, other than as waste or scrap), * * * Provided, That nothing in this Act shall be construed to authorize the regulation of (1) compensation paid by an employer to any of his employees, or (2) rates charged by any common carrier or other public utility, or (3) rates charged by any person engaged in the business of selling or underwriting insurance, or (4) rates charged by any person engaged in the business of operating or publishing a newspaper, periodical, or magazine, or operating a radio-broadcasting station, a motion-picture or other theater enterprise, or outdoor advertising facilities, or

(5) rates charged for any professional services."

Note: Item (1), supra, was altered by the Amendment of October 2, 1942, authorizing the President, under certain limitations, to "provide for making adjustments with respect to prices, wages, and salaries, to the extent that he finds necessary to aid in the effective prosecution of the war or to correct gross inequities * * *." 50 U.S.C.A. Appendix § 961.

[5] People v. Federal Security Co., 255 Ill. 561, 99 N.E. 668; see, also, Hewson v. Peterman Mfg. Co., 76 Wash. 600, 136 P. 1158, 51 L.R.A.,N.S., 398, Ann.Cas. 1915D, 346, and cases therein cited.

[6] Webster's New International Dictionary (2nd ed., 1939).

[7] New Jersey Title Guarantee & Trust

business of storing goods for profit. It held that a Title Guarantee and Trust Company "conducting the business of running safe deposit vaults, and warehousing valuable goods and chattels for hire" was a warehouseman within the terms of the Act. We feel, therefore, that we are dealing here with storage services as that term was employed by Congress.

In its brief, complainant has relied heavily upon the argument that the Price Act contemplated regulation only of those commodities the prices of which substantially affect the cost of living. Urging that the rentals received for its services do not bear the requisite proximity to this standard, the complainant contends that its prices were not subjected to the control of the Price Administrator. We do not believe that this contention is sound, either upon elementary economic principle, or upon the more relevant criterion of a fair construction of the Congressional language.

A substantial price increase of any commodity will not, in itself, add appreciably to the living costs of the general public. Its weight is milligramic. But the combined effect of millions of these minute quanta, which singly would not shake the scales, could be catastrophic.

It is true that an increase in complainant's prices, in and of itself, does not substantially affect living costs. Complainant's statement is correct, so far as it goes, but it is deceptive in its intended inference that, for that reason, no purpose is served by the regulation of safe deposit rental rates. Accession to this type of reasoning would virtually destroy the effectiveness of the Act. Complainant's argument is applicable to thousands of commodities besides its own. Clearly, however, the collective effect of so many increased prices could create the very chaotic condition that the Act was designed to prevent. It is plain to us that there is compelling reason to restrain the complainant and others in its class from making their individually inappreciable contributions to what would result in a very appreciable total.

Regardless of economic dictates, the Price Act discloses no restriction upon the definition of "commodity" which conforms to complainant's construction. We have previously expressed our views in respect of the latitude with which the term "commodity" was employed. We feel that if Congress had intended the limitation which the complainant proposes it would have stated so expressly, or it would have enlarged the list of commodities specifically excluded.

In view, therefore, of the clear definition of the word "commodity" and its inclusion of "services rendered * * * in connection with the * * * storage * * * of a commodity * * *," we have no doubt that Congress vested the Price Administrator with authority to regulate the price charged for furnishing safe deposit facilities to store securities, valuable papers, and jewelry.

But the complainant contends that the Price Administrator has not acted effectively to subject its storage service to regulation. This necessitates scrutiny of the regulations promulgated under authority of the Price Act to ascertain whether they included safe deposit storage services rendered in connection with the three types of commodities involved.

The Price Administrator, on August 13, 1942, issued Maximum Price Regulation No. 165, as amended,[8] listing certain commodities for which seller's prices (including prices for leasing)[9] were forbidden to exceed the highest price charged during March, 1942. Among the articles so designated was "(48) Safe deposit rental." On the same date, however, the Price Administrator issued Revised Supplementary Regulation No. 11,[10] excepting certain commodities and services from the imposition of maximum price regulation. Included was:

"(48) Jewelry—repair, engraving or *storage* of, and setting or resetting of precious or semiprecious stones and pearls." [Italics supplied.]

The complainant filed with the Price Administrator its protest objecting to

---

Co. v. Rector, 76 N.J.Eq. 587, 75 A. 931, 932. It is worthy of note that the West Publishing Company has classified safety deposit boxes, not with banks or banking, but in the same category with warehouses.

[8] 7 F.R. 6428.

[9] Section 302(a) of the Price Control Act provides that the term "sale" includes "sales, dispositions, exchanges, leases, and other transfers, and contracts and offers to do any of the foregoing. * * *"

[10] 7 F.R. 6426.

Maximum Price Regulation No. 165, as amended, to the extent that it affected the rentals for storage of jewelry, securities, and valuable papers in safe deposit boxes. Prior to the denial of the protest, the Price Administrator on November 7, 1942, issued Amendment No. 8 to Revised Supplementary Regulation No. 11, altering Item (48) thereof to read:

"Jewelry and articles of gold, silver or plated ware, repair and engraving of, and the cutting, polishing and setting of precious or semi-precious stones and pearls. (Storage of such commodities in safe deposit facilities is subject to Maximum Price Regulation No. 165 as amended; storage otherwise than in safe deposit facilities is subject to the General Maximum Price Regulation.)" [11]

█ The power of the Price Administrator to amend the Regulation pending consideration of the protest is not in issue. Section 204(a) of the Price Act clearly permits it. The protest was denied on November 9, 1942.

With the promulgation of Amendment No. 8 to Revised Supplementary Regulation No. 11, it is clear that the Price Administrator removed the storage of jewelry from the exempt status it possessed under Revised Supplementary Regulation No. 11, and expressly made storage of that commodity in safe deposit facilities subject to Maximum Price Regulation No. 165, as amended.

The storage of securities and other valuable papers in safe deposit facilities had continuously been subject to the general provisions of Item (48) in General Maximum Price Regulation No. 165, as amended.

█ The complainant contends that, in Section 9(a) of the General Maximum Price Regulation, the Price Administrator has specifically excluded from regulation securities and all transactions in connection therewith. The language relied upon is:

"Section 9(a). This General Maximum Price Regulation shall not apply to *sales* or *deliveries* of the following commodities: * * * (15) *Securities*." [Italics supplied.]

As we understand it, the position of the complainant is this: Conceding, for the moment, that securities are commodities, they have been excepted from the class of commodities subject to price regulation by virtue of Section 9(a), which exempts their sale and delivery from such regulation. The complainant poses this question: How, with an eye to Section 9(a), wherein the sale of securities is specifically excluded from the controls of the Price Act, can services such as the storage or safekeeping of securities be considered as a commodity which is subject to price regulation. We cannot follow the complainant's argument. As we view it, the Price Administrator has exempted from control the prices to be charged for only two of the manifold operations involving securities, i. e., the sale and delivery thereof. He did not exclude, and consequently retained within the scope of Maximum Price Regulation No. 165, as amended, the service of storing or safekeeping securities.

█ The complainant argues, finally, that it does not follow, merely because jewelry is permitted to be stored in the vaults, that it is in fact stored therein. It contends that, merely because the renter of the vault is allowed by contract to store jewelry, the presumption that he actually makes use of the vault for such purposes is unwarranted, and consequently cannot be sustained. We assume that the same argument would be used as to securities and valuable papers, were it not for the fact that the complainant contends that they are not commodities as defined in the Act. In our view this is somewhat analogous to contending that a price ceiling may not be placed on the retail sale of a can of beans, because there is no proof that the vendee will eat the contents thereof; or that no ceiling may be imposed on the rental of an apartment, because it would be an unwarranted presumption that the lessee occupies it. But it is immaterial for our purposes whether any securities, valuable papers, or jewelry are in fact stored by the complainant's customers. It is the sale of the right or privilege to store commodities that is involved.[12] Complainant is clearly furnishing a service in connection with the storage of a commodity. The Price Administrator's jurisdiction over the dealings between the complainant and its customers

---

[11] 7 F.R. 9195.
[12] See Hamilton Co. v. Massachusetts, 73 U.S. 632, 640, 6 Wall. 632, 18 L.Ed. 904; Davis v. Boston & M. R. Co., 1 Cir., 89 F.2d 368, 374.

comes in at one point, and at one point only, i. e., when this particular privilege is furnished or agreed to be furnished, and the price paid or agreed to be paid. It is this phase of the arrangement which constitutes an exchange of a commodity. "Price" is defined in the Price Act [13] to be "the consideration demanded or received in connection with the sale of a commodity." "Sale" is defined [14] to include "leases, * * * and contracts and offers to do any of the foregoing [including leasing] * * *." When a safe deposit box is rented or the privilege of storing commodities is sold, so far as concerns the exchange of value and property rights, the transaction is completed with the sale of the right to store the commodities involved.

We therefore hold that the prices charged for the rental of the complainant's safe deposit box facilities are within the class which the Price Administrator was authorized to subject to regulation by the terms of the Price Act, and that he has proceeded properly under the authority delegated to him to subject this commodity to such regulation.

The complaint is dismissed.

## ARMOUR & CO. OF DELAWARE v. BROWN, Price Adm'r.