**WHITE TRIMMING HOUSE, Inc., v. PORTER, Price Administrator.**

**No. 278.**

United States Emergency Court of Appeals. Heard at New York Feb. 20, 1946.

Decided March 15, 1946.

Jack Entmacher, of New York City, for complainant.

Israel Convisser, Atty., Office of Price Administration, of Brooklyn, N. Y. (Richard H. Field, Gen. Counsel, Jacob D. Hyman, Associated Gen. Counsel, John O. Honnold, Jr., Chief, Court Review, Price Branch, and Frederick Fishman, Atty., Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LINDLEY, Judges.

LINDLEY, Judge.

In the spring of 1945 the Office of Price Administration learned from official governmental statistics that since May, 1943, there had been an increase in the cost of living equivalent to 1.3%, the greater part of which was due to advance in the cost of personal apparel. The clothing index stood at 127.5% in May, 1943 and at 142.9% in February, 1945. During the same period food prices had fallen about 4½% and most other factors included in the compilation except household furnishing had remained relatively stable. Retail prices of clothing in 1945 were 42.9% higher than at the outbreak of the war in Europe in September, 1939; 40% of this advance had occurred after September, 1942, approximately 20% in 1944. This increase had resulted largely from manufacturers' shift from production of lower priced lines to that of higher priced garments, the official figures indicating that ¾ths of the advance in cost of clothing in 1943 was due to disappearance of low priced goods. This shift had reacted almost entirely upon wage earners of low and medium income groups, inasmuch as they had been forced to buy higher priced goods instead of those they normally bought. For these groups the cost of infant's sweaters had increased 200%; cotton house dresses had risen from $1.09 to $2.39 and other low priced goods had increased accordingly.

The Administrator found that this lack of stabilization of clothing prices was due partly to the fact that war procurement officials had taken an extraordinarily great proportion of the cheaper textiles. In addition to this however, low priced material, ordinarily used in lower priced apparel, had been frequently diverted to manufacturers of higher priced apparel who, combining it with high cost trimmings, had concentrated upon high priced goods and abandoned lower priced products. In many instances, it was found, the difference between lower and higher price lines was actually only in styling. The material used in the higher priced articles had frequently been of no better quality than that in low priced goods.

At that time no action had been taken to prevent the shift to higher price lines or to deter a manufacturer from dropping all his

low price lines and concentrating on higher priced goods. Desiring to improve the situation and prevent increase in cost due to the shift from lower priced articles to higher priced garments, the Administrator promulgated Supplementary Order No. 108 on April 19, 1945, effective April 28, 1945 (10 F.R. 4336). This regulation requires manufacturers of apparel and accessories used therein to sell their products at average prices no higher than their average prices in the base period. They are required to compute their weighted average price in 1943, either by quarters, half-years, or the full year and this weighted average price becomes the maximum average price for each corresponding period beginning June 1, 1945. The manufacturer is free to choose the manner of procedure whereby he can achieve adherence to the maximum average price. He may manufacture only the highest and the lowest lines or only average priced lines or such articles at such prices as will result in averages no higher than those in his base period. If he runs over the average price in any category for any quarter, a surcharge is made against him which he must offset in the future. If at the end of the quarter he has not sold a sufficient quantity of low priced goods to offset the surcharge, he is not permitted to deliver any garments at prices higher than the average price until the surcharge has been dissipated.

The order was part of a governmental plan to abolish what the Administrator conceived to be an evil resulting in higher prices, other regulations being Supplementary Order 110 (10 F.R. 5404) and Supplementary Order 113 (10 F.R. 9265), establishing maximum average prices for rayon and wool fabrics. These various orders, coupled with Amendment 26 to Maximum Price Regulation No. 127, "Finished Piece Goods" (9 F.R. 14014) were all part of the complete program. Maximum Price Regulation No. 580 (10 F.R. 3015), governing sales at retail, was issued in order that restricted prices, in pursuance of other parts of the program, might thereby be reflected automatically in retail prices. In other words it was thought that price control at successive stages of production and distribution would enable manufacturers to produce, and consumers to buy, cheaper clothing.

Complainant on August 1, 1945 protested the order. It did not attack the legality or propriety of the controls or the methods of procedure provided by the order, admitted that it is a manufacturer within the terms of the regulation and presented the contention that the regulation is invalid as to it because to include it in such regulation in no way effectuates the purposes of the act or of the regulation but amounts to assumption of arbitrary authority by the Administrator and brings upon complainant unreasonable financial hardship. The protest was referred to a Board of Review, who recommended that it be denied; this report the Administrator approved. Thereupon complainant came to this court, relying upon the contentions made in the protest.

Complainant is a manufacturer of women's collars, cuffs, collar and cuff sets, dickies and jabots, which it sells only to dress manufacturers. Its salesmen visit the manufacturers' designers and are advised as to the type of neckwear required. Following this, complainant prepares sketches, which are then submitted to the dress designers and, after the parties have conferred, the style and price are ultimately determined by the manufacturers in accord with their requirements. The designs include specifications as to the number of pleats, stitches and color. So, says complainant, its business is similar to that of a contractor or custom tailor and it should not be included in a regulation fixing the prices of manufacturers.

 Complainant contends that its sales do not affect the cost of living index, inasmuch as its products are not sold to the ultimate consumer. Such a contention we think can not be approved. Thus we said in Philadelphia Coke Co. v. Bowles, Em. App., 139 F.2d 349, 355: "The Emergency Price Control Act [50 U.S.C.A.Appendix § 901 et seq.] is not directed at the stabilization of retail prices alone but gives authority to stabilize prices at every level of production and distribution. Its stated purpose is not only to protect consumers from inflationary increases in the prices of commodities they must buy but also to afford similar protection 'to persons engaged in business.'" cf. Lincoln Savings Bank v. Brown, Em. App., 137 F.2d 228. It seems obvious that, if the price of one or more constituent elements were allowed to advance, the dress manufacturer would be forced, in order to adhere to his ceiling prices, to reduce other cost factors with consequent deterioration

in quality equivalent to a price increase. We think it equally obvious that the establishment of average prices for the completed garment necessitates similar ceiling prices for each of the constituent elements of the completed article. We have no doubt that a manufacturer of rugs or rubber mats receives specifications based upon its vendee's needs as to quality of material and dimensions of the rugs and mats to be placed in automobiles, the cost of all of which goes into the final sales price of the manufacturer. It would seem clear that the cost of such items, entering into the completed article, must be controlled in order to achieve the objective, that is, the sale of the completed article within the maximum ceiling price.

We conclude that the purpose of Supplementary Order 108 having been to effectuate a return of low priced apparel, it was not unreasonable, in addition to controlling the price of the finished product, to control the price of the different elements that go into it. We think the order is not arbitrary or capricious. The entire textile industry is placed in the position which it had created on a competitive basis in 1943. If the complainant's prices are lower than those of its competitors, it is because complainant has voluntarily fixed them in a competitive market. See Pfeiffer Brewing Co. v. Bowles, Em.App., 146 F.2d 1006, certiorari denied 324 U.S. 865, 65 S.Ct. 914; Mevorah v. Bowles, Em.App., 151 F.2d 766.

True a dress manufacturer may sell high priced as well as low priced items; so, too, may a trimming manufacturer. But each is subjected to the average maximum price ceiling and is governed by the same provisions and by the same yardstick. Each must balance his sales of higher priced goods with sufficient low priced items to maintain average prices no higher than the average prices maintained in the base period.

Complainant's contention that the regulation is invalid on the ground that it applies to items sold only to manufacturers rather than to ultimate consumers we have considered in other cases and held without merit. Philadelphia Coke Co. v. Bowles, Em.App., 139 F.2d 349; Lincoln Savings Bank v. Brown, Em.App., 137 F.2d 228.

Complainant urges that its activities will not influence the attempted control of flow of fabrics to manufacturers. But we must keep in mind that it is the intent of the order and of the governmental program, as embraced in this and other regulations we have mentioned, to nullify any advantage in the purchase of textiles or trimming that manufacturers of high priced dresses have over those of lower priced garments. It is the intent of the regulation, fully disclosed in the statement of consideration, to prevent inflation of the general level of prices of all constituent parts of the finished garment and, to that extent, to counteract the power of the manufacturers of high price lines to purchase trimmings at high prices and thereby exclude the lower priced manufacturer from available supplies.

In view of the evil to be corrected, i. e. the shift from low priced goods to high priced products, the important role in the increase in the cost of living played by the cost of clothing, the flexibility permitted manufacturers in achieving compliance with their average prices during the base period, and the other facts disclosed in the record, we think we are not justified in concluding that the regulation is not generally fair or equitable or that it does not effectuate the purposes of the price enforcement act or those of the specific regulation complained of, making the control regulation applicable to manufacturers of the various constituent parts of the completed garments, or that it is beyond the scope of the Administrator's authority.

Complainant contends that compliance with the act entails upon it financial hardship. However, it submits no proof whatever that it is now operating or that it will in the near future operate at a loss. It submits no evidence whatever of its current or prewar financial or profit position and certainly no evidence that complainant's position or that of the industry indicates that the order is not generally fair and equitable. Its only evidence is that its volume of business and its payroll have declined. This alone is not sufficient justification for nullification of the regulation.

Judgment will enter dismissing the complaint.