## RELIANCE MFG. CO. v. FLEMING.

### No. 364.

United States Emergency Court of Appeals.

Heard at Chicago, Dec. 2, 1946.

Decided Jan. 3, 1947.

Albert E. Jenner, Jr., of Chicago, Ill. (H. Templeton Brown and Edward H. Hatton, both of Chicago, Ill., on the brief), for complainant.

William R. Ming, Jr., Chief, Court Revew Price Branch, of Washington, D. C. (Richard H. Field, Gen. Counsel, Carl A. Auerbach, Associate Gen. Counsel and Samuel M. Singer, Atty., O.P.A., all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and McALLISTER, and LINDLEY, Judges.

LINDLEY, Judge.

Complainant attacks the Price Administrator's denial of its protest against the quota provision of Section 2.7 of R. M. P. R. No. 208, "Manufacturers' Maximum Prices for Staple Work Clothing" issued August 16, 1944, (9 F.R. 9978). After stating the rules applicable to such manufacturers and effectively establishing dollar and cent price ceilings for such products to wholesalers and retailers, the Administrator added Section 2.7, entitled "Special quota rule on deliveries made by manufacturers" and provided an "Explanation of the special quota rule." This section directed that each manufacturer who delivered work clothing at wholesale prices in 1941 should thereafter "make at least a certain quota of deliveries of staple work clothing" at wholesale prices, the specified percentage of such deliveries being the percentage thus delivered in the base period. If during that time a manufacturer had not been in business, the Administrator announced he would assign to it a wholesale allocation. In further explanation, said the Administrator, if a manufacturer had a wholesale allotment of 40 per cent and expected to deliver 300,000 dozen garments during a certain period, then 120,000 dozen garments would have to be delivered at wholesale prices and if at the end of a year a manufacturer had failed to meet his quota, he would have exceeded his ceiling prices to the extent of the deficiency and would be "liable to civil and criminal penalties accordingly."

Early in 1946 the Administrator instituted an action against complainant, a manufacturer of staple work clothing, seeking to enjoin it from violating the regulation and

to recover treble damages. Thereupon complainant filed its protest with the Administrator urging that Section 2.7 constituted an allocation provision beyond the Administrator's statutory power and suggesting invalidity upon certain other grounds, which, in view of our conclusions, we do not deem it necessary or helpful to discuss. The Administrator denied the protest. In due time complainant filed its complaint in this court.

The Congress, in its legislative attempt to prevent inflation and protect the national economy, dealt with two phases of the problem confronting it. In the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 901 et seq., it vested in the Price Administrator power to control prices of commodities and rents, fixing certain specified standards for him to follow, and, incidentally to this activity, power to take such steps as to promote the purposes of the Act and as to prevent circumvention or evasion of his orders. The Act was silent as to any power to allocate or fix quotas for distribution until Congress in 1946 by an amendment provided that "Nothing in this Act shall be construed * * * as authorizing any regulation or order of the Administrator to fix a quantity or percentage of any product which any seller may sell to any buyer." 50 U.S.C.A. Appendix, § 902(j). In contrast, the Second War Powers Act, 50 U.S.C.A. Appendix, § 633, gave the President, whenever satisfied of the existence of certain specified facts, power to "Allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest * * *" and authority to delegate such power. Again, apparently to make clear its intent, Congress in 1946, by an amendment, Section 1503, 50 U.S.C.A. Appendix, § 645b provided that nothing contained in that Act should be so construed as to authorize fixing maximum prices. This power of allocation the President has delegated in certain respects to various governmental agencies, including the Price Administrator, (Oswald & Hess Co. v. Bowles, Em.App., 148 F.2d 543), but there has at no time been a delegation to the latter of power to fix quotas of deliveries of work clothes.

We think it clear from the words of the two acts and from their legislative history that Congress saw fit to lodge the two activities in two separate agencies and that it intended that when it was deemed essential by the President that the Price Administrator have some power of allocation of commodities in enabling him to implement price control it gave the President full power to delegate as much or as little such authority as he deemed proper or necessary and that, in the absence of such delegation, the authority to allocate or fix quotas remained in the President. In other words, in the absence of such delegation by virtue of the War Powers Act, the Administrator was bereft of power to fix quotas of distribution of commodities. Thus, in Oswald and Hess v. Bowles, Em.App., 148 F.2d 543, 546, this court approved a regulation which fixed quotas of meats to be sold to purveyors of meals, not because of any power in the Administrator under the Price Control Act but because of the power delegated to him under the War Powers Act, saying " * * * Complainant would still be forbidden to sell fabricated cuts to purveyors of meals by force of the quoted restriction in sec. 1364.-415, which was promulgated by the Administrator pursuant to delegated authority derived from the Second War Powers Act * * * and not under the authority conferred upon the Administrator by the Emergency Price Control Act."

So, here, we think it obvious that Section 2.7, which in fact follows and supplements the establishment of maximum prices for work clothing, constitutes an attempt on the part of the Administrator to fix quotas for deliveries unsupported by any power under the Price Control Act or by any delegated power under the War Powers Act so to do. Thus, the Administrator himself designated it "special quota rule," added an "Explanation of the special quota rule" and specified that deliveries should correspond to the quotas and that each manufacturer should make "at least a certain quota of deliveries of Staple Work Clothing" at wholesale prices. In his statement of considerations the Administrator approached the problem "from the standpoint of distribution" and declared that he was acting in order "to insure wholesalers

\* \* \* that supplies will be available to them" and that the "objective is achieved by requiring manufacturers \* \* \* to make a proportion of deliveries at wholesale prices \* \* \* which is equivalent to the percentage of deliveries made at wholesale prices in 1941." The connotation of these and others of his self-chosen terms is consistent only with the conclusion that the regulation was purely an allocation measure fixing quotas of deliveries. It seems clear that the Administrator thought, erroneously, that he had the power to control distribution as well as price ceilings.

When we consider the practical working of the regulation, the soundness of our conclusion becomes even more obvious. Thus, if at the end of the year, complainant has sold its product to its customers at the respective ceiling prices fixed by the Administrator, there will have been no violation of ceiling prices, but, if the quotas are not adhered to, there will have been a violation of quotas, a violation based entirely upon diversion of deliveries from sales at prices to wholesalers to sales at prices to retailers.

But, says the Administrator, the regulation only "Effectuates the purpose of the Act" within the proper range of Sections 2(a) and 2(c) and "Prevents circumvention and evasion" within the scope of his authority under Section 2(g). Assuming that the asserted power to issue the quota section of the regulation was inspired by the legitimate purposes mentioned, it does not follow that Congress has endowed him with such power. In other words, the issue is whether, in the absence of an express grant of such power as he has attempted to assert, the Act necessarily implies such a grant. The Administrator

"may not exercise authority beyond that granted him by Congress." Reichel-Korfmann v. Porter, Em.App., 155 F.2d 730, 731. In the words of the Supreme Court in M. Kraus & Co. v. United States, 327 U.S. 614, 66 S.Ct. 705, 707, "This delegation to the Price Administrator of the power to provide in detail against circumvention and evasion, as to which Congress has imposed criminal sanctions, creates a grave responsibility. In a very literal sense the liberties and fortunes of others may depend upon his definitions and specifications regarding evasion. Hence to these provisions must be applied the same strict rule of construction that is applied to statutes defining criminal action." Regulations admittedly promulgated with the purpose of preventing evasion and circumvention under Section 2(g) or any other section must lie within the statutory limitations of the power granted. We can read into those sections no implied grant of power to allocate and fix quotas expressly granted the President by another statute, the War Powers Act. We find in the two acts no evidence of congressional intent that the Administrator be endowed with power to fix quotas of quantities of deliveries of commodities as well as prices but rather an intent that if such power is to be exercised, the Administrator must first secure from the President a delegation of such power under the War Powers Act, as he has done in other instances.

In view of our conclusion, we find it unnecessary to discuss other grounds of invalidity suggested by complainant.

Judgment will enter declaring Section 2.7 of Revised Maximum Price Regulation No. 208 invalid.