ADRIAN, Inc. v. FLEMING.

No. 394.

United States Emergency Court of Appeals.

Heard at Los Angeles April 7, 1947.

Decided May 1, 1947.

Gordon F. Hampton, of Los Angeles, Cal. (Sheppard, Mullin, Richter & Balthis, Arthur H. Deibert and Dempsey, Thayer, Deibert & Kumler, all of Los Angeles, Cal., on the brief), for complainant.

William R. Ming, Jr., Associate Gen. Counsel, of Washington, D. C. (Carl A. Auerbach, Gen. Counsel, and Israel Convisser, both of Washington, D. C., Stanley M. Riesner, of New York City, and Catherine W. Goldman, of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.

LINDLEY, Judge.

Complainant, a manufacturer of women's apparel, asserts invalidity of Supplementary Order 108, Special Order No. 9 and Revised Special Order No. 9, commonly known as the maximum average price regulations. Despite the present status of price control, in view of the fact that a suit to recover treble damages is pending, this court retains jurisdiction to determine the validity of these orders during the period covered by the Administrator's suit. Montgomery Ward & Co. v. Bowles, Em.App., 147 F.2d 858.

Originally the prices of manufacturers of such products were controlled by MPR-153, MPR-287 and RMPR-287, appearing respectively in 7 FR-3901, 10460 and 8 FR-9122, which fixed maximum prices and imposed highest price line limitations. Order 108, 10 FR-4336, supplemented those regulations by providing that each manufacturer's weighted average price for each category of garments in each quarterly period after June 1, 1941, should not exceed his 1943 average price for the same category plus certain provided tolerances. For the categories manufactured by complainant this tolerance was 10 per cent. Manufacturers were required to file a maximum average price chart showing for each category of garments the total dollar volume of sales and the total number of units deliver-

ed in 1943. The maximum average price was to be determined by dividing the dollar volume of sales by the number of units delivered and adding the prescribed tolerance.

Each manufacturer was permitted to concentrate upon sales at his highest and lowest price lines, or on sales at the average price, or on sales in any combination that would result in an average price for each category no higher than that of the base period. But if he exceeded his maximum average price in any category in any quarter he was debited with a surcharge and, if he did not have compensating credits resulting from sales of other categories at less than the maximum average price, he was required to make sales in the succeeding 30 days at prices sufficiently below his average to offset the surcharge. If he did not discharge the surcharge during this period, he was not permitted to make any deliveries in any category at prices higher than his maximum average price until the surcharge was satisfied.

The "make-up" period was extended to November 30, 1945 by Amendment 6 to Supplementary Order 108, issued October 17, 1945, effective October 22, 1945, 10 FR-12984. Special Order 9, issued December 3, 1945, effective as of December 1, 1945, 10 FR-14746, however, permitted deliveries to be made during December, 1945, at prices higher than the maximum average prices, even though previously incurred surcharges were still outstanding, provided the total amount of money received was no greater than would have been received had all deliveries been made at the maximum average price. If a manufacturer saw fit to follow this method, the amount by which his total sales in December, 1945, exceeded the amount he would have received had he made all December deliveries at his maximum average price, constituted an overcharge. If he followed the method of limiting his individual prices to the maximum average price, any delivery at a price in excess of such maximum average price constituted an over ceiling sale.

According to respondent, complainant incurred a surcharge of over $50,000 in the period June 1, 1945 to September 30, 1945. During the next two months it had a credit in one category and surcharges in others resulting in an additional net surcharge of over $5,000. In December, 1945, it sold individual garments at prices in excess of its maximum average prices and the total of all its sales during that month exceeded by $10,644.39 the sum which it would have received had the same number of units been delivered at the applicable maximum average prices. To recover these overcharges respondent brought the suit against complainant in the District Court.

On June 28, 1946 complainant filed a protest against Supplementary Order 108, Special Order 9 and Revised Special Order 9, which was referred to and considered by a board of review who recommended denial on November 15, 1946. On November 27, 1946, the Administrator issued an opinion and order denying the protest.

Complainant contends that the limitations imposed by the orders attacked are not within the authority of the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 901 et seq.; that they do not establish ceiling prices but constitute, rather, attempted control of production and distribution and, in effect, force manufacturers to follow a set pattern in quotas of production and compel production of the specified quotas in each category. This latter effect, complainant insists, is directly in face of the mandate of Congress contained in the Act, Section 4(d), that the Administrator shall not require any person to sell any commodity. Complainant voices other objections in support of its assertion of invalidity, but, in view of our conclusions, we do not think it necessary to discuss them.

Respondent asserts that the orders established a maximum price within the authority of Section 2 of the Act, in conflict with neither Section 2(h) nor 4(d); that they reflect proper exercise of power, delegated to the Administrator, to prescribe maximum prices, are generally fair and equitable, and not, in any respects, contrary to law.

The question presented, then, is whether Order 108 and the orders supplementing it lie within the power granted by the Congress to the Administrator or whether, in contrast, they constitute an attempt to go beyond price control and to

govern the character and amount of respective categories produced. Obviously, the Administrator may not, under the guise of price control, force any manufacturer to make and sell a certain commodity, for Congress has expressly forbidden such action. This, if it needed demonstration, was our announcement in Reliance Mfg. Co. v. Fleming, Em.App., 158 F.2d 990. In that case we set aside that portion of RMPR 208 which attempted to fix the respective proportions of products the complainant might sell and deliver to wholesalers and to retailers. The statement of consideration of the Administrator accompanying Supplementary Order 108 reveals a similar purpose here. After reciting his previous action in fixing maximum prices for apparel and in providing the highest price line limitations, he announced that he had now taken what he considered a further necessary step, viz., maximum average price regulation. He mentioned the "intimate relationship of price and supply aspects" and directed attention to the "disappearance of and relative shift away from the production of lower price lines." He remarked that one cause of this shift was that "the bulk of the military procurement has been in the lower cost fabrics"; that much of that category "now goes to the Army and Navy"; that there were other causes contributing to the existing phenomenon; that existing price regulations had "done little to impede the shift to higher price lines"; that they had not prevented a drop in production of lower price lines and that he had, therefore, entered Order 108; that General Preference Order M-388 of WPB "channels the greater proportion of the textile fabrics available for civilian use into the manufacture of the most essential apparel items"; that his order S-108 would contribute to avoidance of the shift by requiring that each producer "restore on the average his price lines in the base period." The order, said he, "requires each producer to restore his average price lines."

Inasmuch as ceiling prices for all categories had already been fixed, the clear intent of the order was to require the production of the same proportionate amounts of the variously priced garments as had been made during the base period. In short, the Administrator proposed to cure the disappearance of one category from the market by forcing manufacturers to make good that disappearance by manufacturing more of that category. Thus he said further that the order applied to manufacturer's "deliveries" and did not "compel reduction of prices" but "compels the * * * restoration of an earlier pattern of sales by price lines" and, to the extent the manufacturer has shifted towards manufacturers of higher price lines, he "will have to shift back" to production of the lower priced garments. The Board of Review found, the order "was designed to check" the tendency not to produce lower price lines. The Administrator said further, in his statement of considerations, "This order is one part of a broad government program * * * to assure the adequate production of essential garments." Mr. Paul Porter testified before the Senate Committee, "OPA channeling programs have been recently extended to direct more production into essential low-cost fabrics." OPA, on May 10, 1946, filed a memorandum with the Senate Committee on banking and currency in which it said: "This method, the maximum average price plan, requires a manufacturer in any quarter to deliver garments in a category covered by MAP at an average price." Indeed, the intent of the order itself is clear from these words: "Manufacturers subject to this order are required to maintain or restore their sales of low priced items to the extent necessary to keep the weighted average of their prices during each calendar quarter of the year from exceeding a 'maximum average price.'" These terms can have but one import,—that the order contemplated compulsion to produce in amounts in accord, to use the Administrator's words, with a fixed "pattern." The Administrator believed there had developed a tendency to quit manufacturing lower priced lines; he planned to drive manufacturers back to this production.

The Administrator's desired result could come about only if the manufacturers produced the same proportions of their variously priced products as formerly. That, we think, is plainly attempted control of

production, through assessment of penalty damages, if the manufacturer does not comply. The expressed objective was to force production of a certain category of merchandise; not to fix maximum prices for that merchandise; they had already been established and were in effect. The order made no change in maximum prices; it did attempt to compel production of desired quotas. This was not price control but attempted control of production,—a function, as we declared in Reliance Manufacturing Co. v. Fleming, supra, not within the Administrator's power under the Emergency Price Control Act. As in the Reliance case, a manufacturer operating under Order 108 might, over the year, comply absolutely with the ceiling prices fixed by the Administrator and violate no maximum price regulation and yet, if he had not produced the quota of each category which the Administrator ordered him to produce, be subjected to a penalty for a violation of directed proportions of production, a violation based entirely upon his failure to produce his specified quota of lower priced lines. As we said in the Reliance case, fixing quotas of production is the function of other governmental agencies, not that of the Administrator.

The Administrator suggests that we have already approved this procedure in White Trimming House, Inc., v. Porter, Em.App., 154 F.2d 113. He overlooks the fact that, in that case, in neither the protest nor the complaint, was the validity of the order attacked upon the ground now urged. Therefore, we could not and did not consider the question now presented. We directed attention to that situation, however, saying that complainant "did not attack the legality or propriety of the controls or methods of procedure provided by the order."

Respondent argues that the situation here is like that in Montgomery Ward & Co. v. Bowles, supra. But the Ward case had to do entirely with maximum prices in one category. It did not involve a requirement to maintain a "pattern" of production.

In the Emergency Price Control Extension Act of 1946, Congress provided that "After July 1, 1946, no maximum price regulation or order shall be issued or continued in effect requiring any seller to limit his sales by any weighted average price limitation based on his previous sales." 50 U.S.C.A. Appendix, § 902(p). Respondent argues that these words "demonstrate a legislative recognition of former administrative authority." We doubt if we can legitimately draw any inference from the Congressional record pertinent to the validity of MAP. The most we believe justified is that Congress was dissatisfied with the practice. It made no attempt to determine the judicial question of the proper limitations upon the Administrator's then existing power; but it did announce that the procedure involved in MAP may not be followed by the Administrator. We think it clear that Congress did not consume time and labor in attempting to construe the legal effect of past events but did indicate its disapproval and a desire to eliminate thence-forward any possibility of such regulation.

Judgment will enter setting aside Supplementary Order 108, Special Order 9 and Revised Special Order 9.