**BEN H. ROSENTHAL & CO., Inc., et al. v. PORTER.**

**BORIN et al. v. SAME.**

**RUBIN et al. v. SAME.**

Nos. 233–235.

United States Emergency Court of Appeals.

Heard at Dallas, July 11, 1946.

Decided Nov. 26, 1946.

Writ of Certiorari Dismissed March 3, 1947.

See 67 S.Ct. 862.

W. B. Harrell, of Dallas, Tex. (J. Manuel Hoppenstein and J. P. Rice, both of Dallas, Tex., on the brief), for complainants.

Carl H. Fulda, Atty., of Washington, D. C. (Richard H. Field, Gen. Counsel, and Jacob D. Hyman, Associate Gen. Counsel, both of Washington, D. C., all of Office of Price Administration, on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

MAGRUDER, Judge.

These three cases, which were consolidated for hearing, were initiated in this court by the filing of complaints pursuant to leave granted by the United States District Court for the Northern District of Texas under § 204(e) (1) of the Emergency Price Control Act, as amended, 58 Stat. 639, 50 U.S.C.A. Appendix, § 924(e) (1). In that court criminal proceedings are pending charging the present complainants with illegal sales of beef carcasses at prices in excess of the maximum prices established by Revised Maximum Price Regulation No. 169—Beef and Veal Carcasses and Wholesale Cuts (7 F.R. 10381), and with illegal sales of dressed hogs and wholesale pork cuts at prices in excess of the maximum prices established by Revised Maximum Price Regulation No. 148—Dressed Hogs and Wholesale Pork Cuts (7 F.R. 8609). Joined as respondents in the present complaints were the Price Administrator, the Director of the Office of Economic Stabilization, and the Defense Supplies Corporation.

In each of the complaints, challenge was made of the validity of RMPR 169 and RMPR 148. Complainants also sought to challenge the validity of certain provisions

of the Directive of the Office of Economic Stabilization issued October 25, 1943 (8 F.R. 14641), and of corresponding provisions of Amendment No. 2 (9 F.R. 1820) to Regulation No. 3 (8 F.R. 10826) of the Defense Supplies Corporation, under which provisions complainants were rendered ineligible for the special subsidy paid to non-processing slaughterers of cattle for failure to establish that they were non-processing slaughterers, as defined, during six consecutive months of 1942, the base period.

By orders entered August 9, 1945, this court dismissed the complaints against the Price Administrator in so far as they were directed against the provisions of RMPR 148. Also, we dismissed the complaints in their entirety as against respondents Defense Supplies Corporation and the Director of the Office of Economic Stabilization; and those portions of the complaints which sought to challenge the validity of the said Directive and the subsidy regulation were stricken from the complaints as against the remaining respondent, the Price Administrator. See Rubin v. Bowles, Em.App.1945, 150 F.2d 860.

As a result, there remains to be disposed of in this consolidated proceeding only the attack upon the validity of RMPR 169. In No. 233, the complainants stand charged with criminal violations of RMPR 169 by sales in excess of established ceilings during January, February and March of 1945. In No. 234, the criminal violations are alleged to have occurred in December, 1943, January, 1944, February and March, 1945. In No. 235, the criminal violations are alleged to have occurred in February and March, 1945. Hence what complainants want of us, to be used by way of defense in the pending criminal proceedings, are declaratory judgments that RMPR 169 was invalid as applied to complainants during the respective past periods of time just mentioned.

RMPR 169 has been before this court in several earlier cases.

In Armour & Co. v. Bowles, 1945, 148 F. 2d 529, we upheld the general validity of the regulation, taken in conjunction with the subsidy program, as applied to processing slaughterers. We gave in our opinion in that case some description of the meat industry and set forth the history of the Administrator's harassed efforts to impose controls on beef prices, beginning with the General Maximum Price Regulation. We also described the subsidy program and the cattle stabilization plan contained in the Directive of the Office of Economic Stabilization issued October 25, 1943 (8 F.R. 14641).

In Heinz et al. v. Bowles,[1] Em.App.1945, 149 F.2d 277, and upon reconsideration, 1945, 150 F.2d 546, we passed upon the current validity of RMPR 169 as applied to the non-processing slaughterers, who are the most numerous group in the industry though they account for only about 15 per cent of the national cattle slaughter. The Administrator recognized that some special provision would have to be made for this important segment of the industry if the non-processing slaughterers were not to be forced out of business. Due to the distinct economic position of this group as contrasted with that of the integrated processing slaughterers who derive considerable profits from the further processing of raw by-products, the Administrator would have been fully warranted in fixing higher ceiling prices for the non-processing slaughterers under his authority, in § 2(c) of the Act, to establish in price regulations such classifications, differentiations, and reasonable exceptions, as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of the Act. He did not do this, because higher ceiling wholesale prices for non-processing slaughterers alone would have destroyed the foundation upon which were based the uniform dollars-and-cents retail prices regarded by the Administrator as essential to effective control of meat prices. Instead, he recommended and procured the adoption of the alternative program put into effect by the aforesaid Directive of October 25, 1943, namely, the payment to non-processing slaughterers of a special additional subsidy of 80 cents a hundredweight, affording them a benefit equivalent to what

---

[1] Incidentally, Ben H. Rosenthal & Co., Inc., one of the complainants in No. 233, was a joint complainant before this court in the Heinz case.

they would have obtained by higher ceiling price differentials in their favor. In the Heinz case, we said (at page 281 of 149 F.2d): "If the maximum prices in RMPR 169, in conjunction with the subsidy payments, do not make adequate provision for the non-processing slaughterers as a group, do not afford a sufficient margin for profitable operation by this the most numerous group in the industry, then the regulation is invalid as to the non-processing slaughterers, despite the fact that the regulation is, as we held in the Armour case, generally fair and equitable as applied to the processing slaughterers who constitute the greater part of the industry by volume of business. We reject the Administrator's argument to the contrary. It is true, the Act does not guarantee a profit to each individual producer. And so, if the maximum prices enabled most of the non-processing slaughterers to operate profitably, the regulation would not be rendered invalid by the fact that an occasional marginal producer in the group could not stay in business under the established ceilings. But it does not follow from this that the Administrator can ignore the disastrous effect of the regulation upon a whole group of producers constituting an important segment of the industry who, because of the nature of their operations, have a common economic situation that sets them apart from the rest of the industry."

Also, we repeated what we had earlier said in Adams, Rowe & Norman, Inc. v. Bowles, 1944, 144 F.2d 357, 360: " 'We are confident that Congress intended, not only that the regulations should be "generally fair and equitable," but that it should be the duty of the Administrator under § 2(c) to avoid or eliminate manifest inequities in exceptional classes of cases so far as this might reasonably be done consistently with the main objective of the Act and with the effective administration of the stabilization program.' " (page 281 of 149 F.2d)

The factual issue in the Heinz case, therefore, was whether the special subsidy paid to non-processing slaughterers in addition to the general subsidy paid to all slaughterers under the cattle stabilization plan made adequate provision for the non-processing slaughterers as a group, in lieu of a price differential in their favor which might have been embodied by the Administrator in the regulation itself pursuant to his power under § 2(c) of the Act. In our first opinion in the Heinz case, we concluded that the maximum prices established in the regulation plus the general and special subsidies had not provided an adequate margin for the non-processing slaughterers as a group, and we entered judgment setting aside RMPR 169 as applied to such group. But upon reconsideration, and in the light of further evidence, we concluded that "the regulation is presently valid even as applied to the nonprocessing slaughterers, whatever it may have been at some period or periods in the past" (150 F.2d at page 547); and we entered a new judgment dismissing the complaint.

We were not called upon in the Heinz case to render a declaratory judgment as to the validity, or invalidity, of RMPR 169 as of some date in the past. Now for the first time that question is presented to us for decision. It is possible, of course, that the maximum prices in a regulation initially valid may become invalid due to a significant shift of economic factors; and vice versa. In making a retrospective declaration as to the validity of a regulation as of some past date, this court should not view the case from the vantage point of hindsight. If, for example, a seller is charged with a criminal violation by an overceiling sale on December 15, 1943, and the question is whether the regulation was valid on that date, we have to project our thinking back to the economic situation as it existed on December 15, 1943, and to decide whether the Administrator then had, consistently with the statutory standards, a rational basis for maintaining the regulation in force in the light of information then available and of the reasonable forecast, as of that date, of the probable impact of the regulation in actual operation.

Complainants have introduced evidence of their individual slaughtering operations tending to show losses during the periods in which their violations are alleged to have occurred. Accepting this

evidence at its full face value, it is nevertheless not conclusive, for, as we said in the Heinz case, if the maximum prices plus the subsidies enabled most of the non-processing slaughterers to operate profitably, the regulation would not be rendered invalid by the fact that an occasional marginal producer in the group could not stay in business under the established ceilings.

█ Complainants have also introduced in evidence portions of the record which was before us in the Heinz case with respect to the effect of the regulation upon non-processing slaughterers who were recipients of the special subsidy. We referred to this evidence in our Heinz opinion on reconsideration (150 F.2d at page 546). There was evidence of actual operating results for the whole of 1944 in respect of 46 non-processing slaughterers claimed to be representative of this segment of the industry. Similar figures for the early months of 1945 were given in respect of 22 non-processing slaughterers. The majority of the companies were shown to be operating profitably, and generally their operating experience was shown to be more favorable than in the prewar years 1936-1939. Complainants in the Heinz case, in their brief on reconsideration, conceded "that in the absence of substantial evidence rebutting that presented by the Administrator the burden of proof shifted to the Complainants and that they have not sufficiently rebutted the Administrator's evidence regarding the year 1944, or the period since the special subsidy of 80 cents was established on November 1, 1943." Aside from the evidence of their individual slaughtering operations, the present complainants have not supplied us with any evidence as to the experience of non-processing slaughterers as a group under the regulation, other than what was before us in the Heinz case. In this state of the record, complainants have failed to sustain their burden of satisfying us that the maximum prices of RMPR 169, in conjunction with the subsidies, did not afford a sufficient margin to the non-processing slaughterers as a group during 1944 and the months of January, February and March, 1945.

As to December, 1943, during which period some of the violations in No. 234 are alleged to have occurred, there is an additional consideration relevant to the validity of the regulation at that time. The special additional subsidy to non-processing slaughterers had not gone into effect until November 1, 1943. As above indicated, the Administrator had determined that the special subsidy was the most feasible way of affording needed relief to this distinct segment of the industry. In view of the uncertainty as to how the cattle stabilization plan would work out, and as to the future movement of cattle prices thereunder, the amount of the special subsidy had been fixed on a somewhat experimental basis. As of November 1, 1943, the Administrator appears to have had reason to anticipate that a special subsidy of 80 cents per cwt. would be adequate to take care of the non-processing slaughterers—certainly there is nothing in the record requiring a contrary conclusion. The Administrator was entitled to observe the actual results of the cattle stabilization plan for a reasonable period of time before it could be said that he was arbitrary or capricious in not providing a still greater differential in favor of the non-processing slaughterers.

█ It is contended that the Price Administrator had an independent duty to establish maximum prices in conformity with the statutory standards, and that in determining whether the Administrator has met such standards no account may be taken of the subsidies to slaughterers provided by another agency of the government. This contention was rejected by us in Rubin v. Bowles, 1945, 150 F.2d 860, 861. It is clearly without merit. The validity of a price regulation cannot be judged in a vacuum. As we said in Armour & Co. v. Bowles, 1945, 148 F.2d 529, 534: "While the subsidy is not a part of the regulation issued by the Price Administrator, its existence is an economic factor which cannot be disregarded in estimating whether the regulation is generally fair and equitable." The payment of subsidies was authorized as one of the mechanisms of the price control program, and, as contemplated by Congress, may operate as compensatory in na-

ture to validate a lower level of maximum prices than otherwise would be permissible under the standard laid down in the Price Control Act for the guidance of the Price Administrator.[2] See Illinois Packing Co. v. Bowles, Em.App.1945, 147 F.2d 554, 556, 557; Illinois Packing Co. v. Snyder, Em. App.1945, 151 F.2d 337, 339.

■ Nor is the objection well taken that the price regulation, considered in conjunction with the subsidy program, is "vague, indefinite and uncertain", so that "a citizen could not know in advance what facts and circumstances would be considered criminal". There is no lack of definiteness in the provisions of the criminal law which complainants are charged with violating. Section 4(a) of the Act makes it unlawful to sell any commodity in violation of any regulation or order issued by the Price Administrator under § 2 of the Act. RMPR 169 forbids the sale of beef carcasses and wholesale cuts at prices higher than the maximum prices established by the regulation. Complainants knew well enough what they were forbidden to do. The only uncertainty, at the dates the acts of violation were allegedly committed, was whether the regulation would ultimately be held valid as of those dates, which depended upon the vicissitudes of litigation and the state of the proof as to the economic consequences of the regulation upon the industry regulated. If complainants chose to violate the regulation, they did so at their own peril. The contention amounts to the fallacious proposition that a law or regulation is invalid because of uncertainty as to its validity.

We have considered other arguments advanced by complainants, only one of which we deem to be of sufficient substance to warrant comment. It is this: Since the provision of the special subsidy was admittedly necessary in order to render the maximum prices in RMPR 169 valid as to the non-processing slaughterers as a group, it follows that the regulation must have been invalid as to any non-processing slaughterers who, for one reason or another under

the terms of the subsidy regulation, were ineligible to receive the special subsidy.

In connection with the foregoing argument, it is to be noted that it is not available to complainant Borin in No. 234. For all that appears in the record, Borin may have been entitled to the special subsidy. Nine months went by after the subsidy was instituted before Borin made informal inquiries as to his eligibility. Further information was requested by the Reconstruction Finance Corporation, a part of which was supplied by Borin. Later Borin notified the RFC that he would "not press for the extra subsidy temporarily", and that as soon as the additional information requested could be compiled the matter would again be taken up. So far as appears, Borin's application for the subsidy is still pending before the RFC; it has not been denied by that agency.

However, the situation of Ben H. Rosenthal & Co., Inc., in No. 233, and Rubin in No. 235, is different. They were not engaged in processing operations during the periods of the alleged violations, and so, as far as their then current operations were concerned, they would have been entitled to the special subsidy. But under the terms of the subsidy regulation, Amendment No. 2 (9 F.R. 1820) to Regulation No. 3 (8 F.R. 10826), issued by the Defense Supplies Corporation, to be eligible for the special subsidy they, or their predecessors in business, had also to have been non-processing slaughterers, as defined, "during six consecutive months of 1942". They were ruled to be ineligible for the subsidy for failure to meet this base period qualification.

The Administrator has offered what seems to us to be a rational exposition of the need for the base period requirement. He says: "The base period limitation for eligibility was deemed essential to proper administration of the subsidy program for two reasons. (1) The extra compensation was necessary to enable slaughterers not engaged in processing to continue in business under price control. It was designed

[2] The standards prescribed are sufficient to render the Act a constitutional delegation of power to the Price Administrator. Yakus v. United States, 1944, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834.

to protect those firms which historically had engaged in this particular type of operation, but not to induce slaughterers heretofore engaged in processing to change their practices for the purpose of obtaining the extra subsidy. Nor was there any intention to encourage new slaughterers by the promise of a special subsidy. The difficulty of determining precisely the amount of differential subsidy needed for the group as a whole, and the probability that in certain areas it would be overgenerous, made it likely that any special subsidy fixed would, at least at some time and in some places, provide such encouragement to enter the slaughtering business or to abandon processing operations. In a market characterized by scarcity of supplies such encouragement would have been utterly unjustifiable. Since the non-processing group constituted a well defined segment of the industry representing about 15% of the total production, it was believed that the Administrator's legal duty to provide relief was limited to those who historically belonged to that segment. (2) Administration of the subsidy program clearly required establishment of a base period as a condition of eligibility. Without a showing of continuity of the same type of operation over a substantial period, the task of determining eligibility would become a practical impossibility as each slaughterer would be able to claim the extra compensation for brief periods during which he did no processing."

Thus, RMPR 169 was "generally fair and equitable" in its application to the industry as a whole, and in view of the provision of the special subsidy it could not be deemed to have been arbitrary or capricious in its general application to that segment of the industry described as non-processing slaughterers. The class of slaughterers eligible for the special subsidy had to be defined, and definition inevitably gave rise to borderline cases where some individuals excluded from the special subsidy might have been subjected to hardship. Here the classification adopted has not been shown to have been unreasonable. The Act does not guarantee a profit to each individual subject to the regulation. As we said in Earl C. Gibbs, Inc. v. Defense Supplies Corp., 1946, 155 F.2d 525, 532, "considerations of administrative workability may render it impracticable to provide complete individualization of treatment."

Judgments will be entered dismissing the complaints.