ENRIQUE MORA ET AL., Petitioners, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, C. SANTANA BECERRA, JUDGE, Respondent; GENERAL SUPPLIES ADMINISTRATION, ETC., Interveners.

No. 2045.   Argued December 4, 1953.—Decided May 14, 1954.

*James R. Beverly, R. Castro Fernández* and *F. Castro Amy,* for petitioners. *José Trías Monge, Attorney General,* and *Edgar S. Belaval, Assistant Attorney,* for the interveners. *M. Avilés Bracero* for the Federación de Comercio de Puerto Rico, as *amicus curiae.*

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

On March 12, 1953 the Secretary of Agriculture and Commerce issued Administrative Order No. 228, effective March 16, 1953, fixing the maximum prices for the sale of rice in Puerto Rico under authority vested in him by § 3 of Act No. 228, Laws of Puerto Rico, 1942, as amended by Act No. 234, Laws of Puerto Rico, 1950. The importers of rice in Puerto Rico filed a motion for reconsideration of Order No. 228, pursuant to § 11 of Act No. 228. A hearing was held on the motion for reconsideration at which testi-

mony was taken. Thereafter the Secretary denied the motion for reconsideration.

The importers filed a petition for review of the Order of the Secretary in the Superior Court under § 12 of Act No. 228.[1] The Superior Court entered a judgment affirming Order No. 228. Pursuant to § 12, we granted certiorari to review the judgment of the Superior Court.[2]

The importers also filed a suit in the United States District Court for Puerto Rico for an injunction to restrain the Secretary from enforcing Administrative Order No. 228. After taking testimony and hearing the parties, that Court denied the motion of the importers for a temporary injunction. *Mora v. Torres*, 113 F. Supp. 309 (Dist. Ct., Puerto Rico, 1953). The importers appealed from the judgment of the United States District Court, which was affirmed by the Court of Appeals for the First Circuit. *Mora v. Mejías*, 206 F. 2d 377 (C.A. 1, 1953).

The opinions of the Superior Court, the United States District Court, and the Court of Appeals all contain detailed findings and statements of fact. It is unnecessary to restate the findings of fact of the Superior Court, which we adopt. The issue as the case reaches us is narrow. Due to the fact that the prices paid by the importers for rice in continental United States have decreased, the petitioners now concede that Administrative Order No. 228 has been valid for several months. They argue, however, that the Order was invalid during the months of March, April, May and June, 1953 as to rice purchased by them during that period in continental United States under open price contracts for which they paid prices higher than those fixed

---

[1] Under § 13(a)1 of Act No. 11, Laws of Puerto Rico, Special Session, 1952, judicial review of such orders is by the Superior Court rather than by the former Supplies Appeal Court.

[2] During the course of the proceedings, the Economic Stabilization Administration of Puerto Rico and the Administrator of the latter were substituted as defendants.

in Order No. 228 as the maximum sales prices in Puerto Rico.[3]

In *Mora* v. *Mejías, supra,* the Court of Appeals made a comment which is pertinent to this contention of the petitioners. It is said at pp. 384–5:

"Plaintiff apparently supposes that Administrative Order No. 228 has been conclusively established to be arbitrary or capricious, and unconstitutional, because, as found as a fact by the court below, plaintiff has on hand a certain quantity of rice which he imported into Puerto Rico at costs per cwt. greater than the wholesale prices fixed in the order. This is not necessarily so, though of course the administrator cannot expect to subsidize the Puerto Rican people indefinitely at the expense of the rice importers.

"   .        .        .        .        .        .        .        .

"It is not denied that the maximum prices established in Administrative Order 228 were valid as applied to stocks of rice in Puerto Rico which had been bought in continental United States while millers' prices there were still subject to federal regulation. For aught that the present record discloses, the administrator may have had reason to anticipate that the rise in millers' prices which occurred just after federal controls were lifted was a temporary flurry, and that importers' costs, in the normal operations of the market, would soon revert to levels consistent with profitable operation at the wholesale prices established in the order. For all we know, the administrator might also have had reason to anticipate that the wholesale prices fixed in the order would in themselves have some tendency to restrain runaway inflation in millers' prices in continental United States because of the important share of Puerto Rico in the export market. *Cf. Great Atlantic & Pacific Tea Co.* v. *Porter,* Em.App. 1946, 156 F. 2d 812."

Both the Court of Appeals and the Administrator proved to be good prophets. All concerned now agree that the rise in importers' costs have reverted "to levels consistent with

---

[3] Under these open price contracts the importers were required to pay the market price prevailing in continental United States at the time of each shipment, plus any increase in freight or insurance, C.I.F. San Juan.

profitable operation at the wholesale prices established in the order." The petitioners would nevertheless have us hold that Order No. 228 was void during the short period when there was "a temporary flurry" which resulted in a rise in millers' prices, and that the Order became valid only as of the date the prices in continental United States dropped below the prices fixed in Order No. 228.

We cannot agree with this contention of the petitioners. "The statutory standard, as expressed in the local statute, adopting the language of the Emergency Price Control Act of 1942 and of the Defense Production Act of 1950, is that the price regulation must be 'generally fair and equitable,' and one that in the judgment of the administrator will effectuate the purposes of the act." *Mora* v. *Mejías, supra,* p. 384. Vindication of his judgment under the statutory standard makes the order of the Administrator under the circumstances of this case valid rather than void *ab initio.* The Court of Appeals made this clear in its opinion in the *Mora* case at pp. 385–6:

"It is recognized, as stated in *Ben H. Rosenthal & Co., Inc.,* v. *Porter,* Em.App. 1946, 158 F. 2d 171, 173, 'that the maximum prices in a regulation initially valid may become invalid due to a significant shift of economic factors; and vice versa.' *But a price regulation does not oscillate between validity and invalidity dependent upon day-to-day variations in market factors. It is the long-run trends that are significant in this connection.* Price regulations are issued not only on the basis of past experience, but also on the basis of reasonable forecasts or anticipations of future market trends. If a price regulation ·is initially valid on this dual basis, the administrator is entitled to observe the actual results of its operation for a reasonable period of time, before a court could conclude that he was arbitrary or capricious in not revising the established maximum prices. See *Ben H. Rosenthal & Co., Inc.,* v. *Porter, supra,* 158 F. 2d at page 174; *Superior Packing Co.* v. *Clark,* Em.App. 1947, 164 F. 2d 343, 352. This is especially true with regard to a commodity historically subject to seasonal fluctuations in prices. See *Counselman* v. *Fleming,* Em.App. 1947, 161 F. 2d

203, 205–206, certiorari denied 1947, 331 U.S. 861, 67 S.Ct. 1756, 91 L.Ed. 1867. See also *Gillespie-Rogers-Pyatt Co., Inc., v. Bowles,* Em.App. 1944, 144 F. 2d 361." (Italics ours.)

In *Ben H. Rosenthal & Co.* v. *Porter,* 158 F. 2d 171 (Em. App. 1946) the Court indicates that the test is whether the Administrator acted reasonably as of the date of the order. The Court said at p. 173:

"  . . . It is possible, of course, that the maximum prices in a regulation initially valid may become invalid due to a significant shift of economic factors; and vice versa. In making a retrospective declaration as to the validity of a regulation as of some past date, this court should not view the case from the vantage point of hindsight. If, for example, a seller is charged with a criminal violation by an overceiling sale on December 15, 1943, and the question is whether the regulation was valid on that date, we have to project our thinking back to the economic situation as it existed on December 15, 1943, and to decide whether the Administrator then had, consistently with the statutory standards, a rational basis for maintaining the regulation in force in the light of information then available and of the reasonable forecast, as of that date, of the probable impact of the regulation in actual operation."[4]

"In a particular case it may be very difficult for us to determine the precise date on which a regulation, valid in its inception, became invalid due to subsequent developments." *Superior Packing Co.* v. *Clark,* 164 F. 2d 343, 353 (Em. App., 1947). In the same way it may also be difficult under other circumstances to determine the exact date an order to sell below cost becomes valid by confirmation of the Administrator's reasoned belief that costs to the vendor will decrease. But here we find nothing in the record which enables us to say that the fixing of a selling price below cost for such a short period was arbitrary and capricious even at its inception. On the contrary, events seem to have shown that by standing firm for a short period the

---

[4] See Hyman and Nathanson, *Judicial Review of Price Control: The Battle of the Meat Regulations,* 42 Ill.L.Rev. 584.

Administrator played an important role in preventing "runaway inflation in millers' prices in continental United States because [among other things] of the important share of Puerto Rico in the export market." *Mora* v. *Mejías, supra,* p: 385. The Administrator's action was reinforced by the following: (1) the prices he fixed were substantially the same as those which had been fixed under Federal controls which had been terminated shortly before Order No. 228 went into effect; (2) the Order was issued at a time when the 1952–53 crop had already been harvested, all expenses involved therein had been incurred, and this crop had been selling at the same price under Federal controls; (3) the open contracts which obligated the importers to pay increases in continental market prices were a new practice under which such risks were deliberately undertaken in the face of prospective local controls, and even under these circumstances the importers in many instances were given the opportunity to cancel these contracts. In view of the foregoing, we cannot say as a matter of hindsight from the record before us that Order No. 228 was void from its effective date of March 16, 1953 until July, 1953. In the light of all the circumstances surrounding this particular order, we hold that Administrative Order No. 228 was valid as of March 16, 1953.

■ What we have said disposes of the first two assignments of error; namely, (1) that Order No. 228 is arbitrary, capricious and contrary to Act No. 228; and (2) that the Order violates the due process clauses of the Constitutions of the Commonwealth of Puerto Rico and of the United States. The third assignment is that the trial court erred in not granting the motion of the petitioners to reopen the case after judgment in order to permit them to present new evidence as to the economic effect of Administrative Order No. 228. The order of the trial court refusing to open the case for that purpose reads in part as follows:

"The additional evidence offered is summarized under oath in the petition of August 18, to the effect that a large part of the rice received by the plaintiffs during June and July at the price of $12.25 per cwt. could not be sold at the price of $12.90 authorized by the Administrator due to the fact that the previous stocks of rice paid for at $13.25 have not yet all been sold; that all the probabilities are that the rice will have to be sold at a price much less than $12 per cwt. because the rice of the new crop to be received shortly is being purchased for less than $10 CIF San Juan; that as long as the price of the rice keeps falling in the supplying market, the plaintiffs have less opportunity to sell the rice involved herein and affected by Order No. 228 at its cost or a higher price due to competition and the effects of supply and demand; and that because of the continuous falling of the price of rice, the plaintiffs would lose forever the opportunity to recoup the initial loss which they allege they suffered because of Administrative Order 228.

"The problem raised by the plaintiffs, in connection with which they have asked leave to introduce additional evidence, may be stated briefly as follows: Due to the inundation of the market with rice purchased at a much lower price, without their having disposed of the stocks of rice they purchased at $13.25 and $12.45, above the maximum price fixed by Administrative Order 228, due to the economic rule of supply and demand and to competition, they will have to sell rice without even making use of the maximum price fixed by the Administrator and below said maximum price, unless, as they stated at the hearing on their petition, they combined and agreed to sell the rice at the maximum authorized price.

"As may be seen the economic problem confronting the plaintiffs because of the subsequent decrease in the price of rice is one that would not be solved for them either by setting aside Order 228 or annulling it. Order 228 fixes maximum prices, not minimum prices. Plaintiffs themselves state that the market situation is such that they could not even sell the rice at the authorized maximum limit. This situation has neither been created by Order 228 nor is it a consequence thereof."

We are in substantial agreement with these views of the trial court. The problem of how low or how high a price he will charge under the circumstances in order to make a

profit on his stocks of rice on an over-all basis is for each importer to determine himself. All the importers are apparently in substantially the same position: they have some stock on hand purchased at figures higher than the prices fixed in Order No. 228; they also are receiving stock purchased at considerably lower figures. We fail to see how the trial court could tie the hands of the Administrator on this matter by giving decisive weight to testimony by importers purporting to represent all of them that they were all now inexorably required by competition to sell all their stocks at figures so far below the prices fixed in the Order that they would never recoup all or part of their losses on that part of their stock which was purchased at prices higher than those fixed in Order No. 228. It is difficult to believe that the importers propose to engage in such mass conduct so unfavorable to their interests. But even if this testimony be credible, the situation would be of their own making and not due to the Order of the Administrator which leaves them free to sell at a higher price. We cannot say that the trial court abused its discretion in refusing to reopen the case after judgment for the purpose of admitting such testimony.

■ The petitioners argue in their fourth assignment of error that Order No. 228 infringes the commerce clause of the Federal Constitution. This point has already been decided against the petitioners by the Court of Appeals in *Mora* v. *Mejías, supra*. It said at p. 387, footnote 6: "It is interesting to note that appellant in this case made a separate constitutional argument that Administrative Order No. 228 constituted an undue and unconstitutional burden upon interstate commerce. In order to avoid decisions like *Buscaglia* v. *Ballester*, 1 Cir., 1947, 162 F. 2d 805, holding that the implication of the commerce clause of the Federal Constitution did not operate as a limitation on the territorial legislature of Puerto Rico, as constituted under the Organic Act of 1917, appellant argued that the 'novel status'

of the present Commonwealth of Puerto Rico falls within the concept of a State within the meaning of decisions holding that a State cannot unduly burden interstate commerce. We did not deal in the body of our opinion with this separate constitutional argument as to the commerce clause since local price regulation by a State, if otherwise valid, is not rendered invalid because of any incidental effect it may have upon the volume of interstate commerce."

█ The fifth error assigned is that Order No. 228 impairs the obligation of contracts of the petitioners, in violation of the Federal and Puerto Rican Constitutions. To agree with the petitioners on this point would be to destroy all possibility of effective price control. Vendors could simply make contracts providing for open prices or for successive increases. Apart from the fact that many of them had the opportunity, which they rejected, to cancel their contracts, these contracts were signed subject to the possibility of future price control. *Mercado* v. *Brannan*, 173 F. 2d 554 (C.A. 1, 1949) ; *Philadelphia Coke Co.* v. *Bowles*, 139 F. 2d 349, 357 (Em. App., 1943) ; *Taylor* v. *Brown*, 137 F. 2d 654, 659 (Em. App., 1943) ; *Méndez* v. *Jiménez, Commissioner*, 72 P.R.R. 315, 320; *Sierra, Commissioner* v. *San Miguel*, 70 P.R.R. 573. The fifth assignment of error is without merit.

The writ of certiorari will be discharged.

Mr. Justice Ortiz did not participate herein.

———————

Mr. Justice Negrón Fernández, dissenting.

This case has ceased to be one wherein rights of property are litigated to become one wherein rights of liberty are asserted. This is none the less a reality because, in order to protect the latter rights, the former may have to be acknowledged. The practical usefulness of the present remedy has been confined to an examination of the merits of the attack by petitioners on Order 228 issued on March 12,

1953 by the Secretary of Agriculture and Commerce of Puerto Rico, and to its effects on many criminal prosecutions now pending against them in the Superior Court. In fact, its only practical effect lies in that it affords petitioners a court of last resort wherein to raise the issue—by way of defense in said criminal prosecutions—as to the invalidity of Order 228, a defense of which they can only take advantage—the alleged infirmities not appearing from the face of the Order—by pursuing, as herein, the statutory procedure authorized by § § 11 and 12 of Act No. 228 of March 12, 1942. *Yakus* v. *United States*, 321 U. S. 414, 88 L. Ed. 834; *Ruiz* v. *District Court*, 71 P.R.R. 358.

The severe penalties imposed by § 13 (*b*) of Act No. 228, as said Section was amended by Act No. 493 of April 29, 1946 (Sess. Laws, p. 1475), in turn amended by Act No. 31 of September 15, 1950 (Laws of 1950–51, p. 248), on any person convicted of a violation of a price-schedule—imprisonment in jail for a term of not less than thirty (30) days nor more than two (2) years, and in addition by a fine of not less than one hundred (100) dollars nor more than ten thousand (10,000) dollars, and in default of the fine, to imprisonment in jail for one day for each dollar he fails to pay (not to exceed 90 days pursuant to § 54 of the Code of Criminal Procedure) and without the benefits of any law permitting the suspension of sentences—makes it imperative that a thorough examination be made of the issues involved herein.

I agree that "the statutory standard, as expressed in the local statute, adopting the language of the Emergency Price Control Act of 1942 and of the Defense Production Act of 1950, is that the price regulation must be 'generally fair and equitable', and one that in the judgment of the administrator will effectuate the purposes of the Act." *Mora* v. *Mejías*, 206 F. 2d 377, 384. But in this suit there are elements which, *by virtue of the very statutory standard* governing the exercise by the Administrator of the power

delegated to him by the Legislative Assembly, and of the scope of the price-regulating power of the State, render null and void Order 228 as applied to petitioners with reference to part of their property.

As appears from the record,[1] in establishing ceiling prices for rice by Order 228, the Secretary used the system of fixed prices and not the system of markups.

---

[1] In Exhibit 30, entitled "Statement of Economic Data and other Facts of which the Administrator has taken Notice", dated June 24, 1953, the following appears:

"2. *Specific Prices, the Best Technique for Effective Price Control in Puerto Rico.*

"Sixty per cent of the population of Puerto Rico live in rural areas. The typical family there consists of 5.2 members and enjoys an annual cash income of $550. In other words, the per capita annual cash income is about $106. The educational level of the adult rural population is the fourth grade.

"According to the 1950 Census of Business there were 16,747 food retail establishments with a reported average annual volume of Business of $6,515. Besides, there is a very complicated and expensive system of distribution of food, running from the importer to the wholesaler to the wholesaler-retailer to large retailers to very small retailers.

"These facts lead to the conclusion that specific prices, not formula prices, is the only adequate technique for effective price control in the Commonwealth.

"Both Federal Agencies, the Office of Price Administration and the Offices of Price Stabilization, always recurred to this technique, whenever feasible, especially in the case of staples.

"There is a very good recent example under the Office of Price Stabilization, in the case of codfish, of the use of specific ceiling prices of an staple imported from a country of origin where there is no price control. In the summer of 1952, after having granted increases to codfish coming from Canada and Newfoundland the previous year, exporters asked for an additional increase of three cents a pound. In neither foreign country there was price control. After the Local, Regional and National OPS offices studied the problem, it was decided that the increase to be granted was to be one and one half cents only. For two months the Newfoundland Association of Fish Exporters withheld codfish shipments to Puerto Rico on the ground that the wholesale ceiling price set was too low. After two months their position was untenable and resumed shipments to the Commonwealth.

"Such was also the case in 1951 of beef in the carcass imported from the Dominican Republic. In this case the Dominican Republic abattoir held out for one year because it was able to switch its exports to the Continental United States. In this case the wholesale ceiling established by OPS was 35 cents in contrast with 40 cents asked.

It is evident that, by using the system of fixed prices rather than the system of markups in his Order 228 establishing ceiling price-schedules for rice, it was the main purpose of the Secretary to prevent the Puerto Rican consumers from suffering the consequences of speculative practices on the part of continental rice growers. Until February 25, 1953, date of federal decontrol, the policy adhered to by the pertinent federal agency was precisely that of markups, a policy whereby rice importers were allowed a profit of 84 cents on rice of superior quality, and of 75 cents on rice of inferior quality, per bag of 100 pounds. Under federal control, this policy resulted in no hardship for the Puerto Rican consumer, as the federal police power reached all levels of production and sale, the millers could not sell at a price higher than that established pursuant to such regulation, and the importers, as well as other

"A policy of markups regulations only whereby cost increases at the supply sources outside the Commonwealth would be passed through to consumers all along the channels of distribution would be very loose price control for the sake of stabilization of the economy but rather it would be just simple control of business. Puerto Rico has an open economy. Our well-being depends on the maintenance of our trade terms. Present extraordinary world conditions and weakness in the bargaining power on the part of the Puerto Rican importers are influences which constantly threaten to deteriorate our trade terms. Rice is a good example of this situation. We should take all necessary steps to avoid it.

"According to the official publication of the United States Department of Agriculture, 'Agricultural Prices', as of April 1953 never before had sugar cane been closer to parity—$7.95 a ton as compared to $8.32 parity price—but still under parity: 95.5 per cent of parity. On the other hand the price of rice in April 1953 was 130 per cent of parity.

"Wages of sugar cane workers—the largest proportion of farms hands in an agricultural economy—are tied, by determination of the United States Department of Agriculture, to the price of sugar. If sugar prices (the prices we receive) do not go up at about the same tempo as prices in the Mainland go up (the prices we pay) a serious disrupture is caused in the trade terms and in the long run in the balance of payments. The effects of such desequilibrium are not instantaneous; they are cumulative because of the credit system prevailing at the retail level in the Commonwealth. Consumers commit themselves to pay prices even if these could not be paid in the long run. Sub standard of living budgets, specially in food items, can not be stretched much further. Default is inevitable."

middle-men, could obtain the profit allowed.[2]    In making use of the fixed or specific price policy in his local price regulation, the Secretary acted wisely, as the increase in the price of rice by millers came about immediately after federal decontrol, and the Puerto Rican importers—who in fact are the first middle-men between the producers and the consumers—had to purchase at prices prevailing in a decontrolled market, without any protection other than the "weakness in the bargaining power on [their] part."    See footnote (1).

However, the Secretary—farsighted as he was in making use of the fixed or specific price policy—failed to be so in two other aspects: (1) in not promulgating his Order sufficiently in advance so that it would become effective at the very moment that federal controls ceased, thereby avoiding, because of the economic impact if not by the legal effect of such order, the rise in the price of rice to Puerto Rican importers and (2) in overlooking a reality which, in fact and in law, he was fully aware of: that from February 25, 1953, date on which federal controls on rice ceased—controls which extended to all levels of production and sales—to March 16, 1953, effective date of his Order 228, there was a period, though of short duration, with no controls whatsoever, either federal or local, and that during that period, the Puerto Rican importers purchased rice at prices higher[3] than the

---

[2] In the Exhibit referred to in note one, *supra*, and under subdivision 4 entitled "Movement of Rice Prices", the Secretary of Commerce states as follows: "Before Korea, California Pearl Rice, 15 per cent broken, was sold to Puerto Rico at $7.90 per hundredweight.  Adding to this price 35 cents per hundredweight for enrichment, we obtain a total price of $8.25 per hundredweight.  This price gradually increased to $11 per hundredweight.  By the end of 1952 the price of rice furtherly increased to $11.25.  By January 1953 the price was $12 per hundredweight.  This was the last authorized price by the Office of Price Stabilization.  After price controls were suspended the price of rice was furtherly increased to $13.25 per hundredweight.  It was at this point that the Commonwealth government issued Administrative Order No. 228 fixing prices of rice at the different distributive levels."

ceiling prices later on established by him in his Order 228.

Proceeding from the reality of fact and law set forth above—that the Puerto Rican importers had purchased supplies of rice during a period exempt from federal and local controls at prices higher than those established later on by Order 228 in its price-schedule—the issue in this suit is limited to deciding whether in the exercise of the powers granted him by Act No. 228 of May 12, 1942, as amended, the Secretary could provide that any sale from such stock was subject to the ceiling prices established by him in said Order, thereby bringing about a loss to the importers—a loss which the Secretary well knew would result from those sales.

There is no doubt that the Secretary relied on the fact that, because of the importance of the local market to continental rice growers, the restriction on trade or total cessation of purchases by Puerto Rican importers at millers' high prices would have to produce a regression in the existing

---

[3] Purchases during this period exempt from controls were consummated at the time the rice was delivered, at the port of origin, on board the ship which was to bring it to the island. The selling price was that prevailing in the market, $13.25 for rice not more than 15 per cent broken, plus insurance and freight (C.I.F.). From that moment—date of such delivery at the port of origin—the title passed to the purchasers.

A C.I.F. sales contract is one for the sale and delivery of merchandise at a price which includes the cost thereof, insurance and freight charges to the place of delivery and, unless the contrary appears from the contract itself, the seller performs his part of the contract when he delivers the merchandise at the place of origin from which it is to be transported, pays the freight from there to the place of delivery and forwards to the consignee the documents connected with said shipment, the policy of insurance and the receipt showing payment of the freight. *Thames & M.M. Ins. Co.* v. *United States*, 237 U. S. 19, 59 L. Ed. 821; *Seaver* v. *Lindsey Light Co.*, 235 N. Y. 273, 135 N. E. 329, 330. The title to the thing which is the object of the contract passes to the purchaser at the time of its delivery at the place of origin, this being the uniform interpretation which courts must give to said contract in harmony with the customs of merchants throughout the world. *Northern Grain House Co.* v. *Northwestern Trading Co.*, 117 Wash. 422, 201 Pac. 903, 904. Under such a contract there is no obligation on the part of the seller to deliver the goods at the port of destination. *National Wholesale Grocery Co.* v. *Mann*, 251 Mass. 238, 146, N. E. 791.

rise in price and millers would be forced to reduce prices to importers "to levels consistent with profitable operations at the wholesale prices established in the Order". *Mora* v. *Mejías, supra.* But for the Secretary's prophecy to come true, he had to imagine, as a related indispensable factor, that the Puerto Rican importers would stop purchasing rice from the mills at prices in the continental market at the time of shipment for a period of time sufficient to allow losses in the Puerto Rican market to be felt.[4] This factor also meant that the Puerto Rican rice importers, in general, would have to abandon that phase of their commercial activities, or, should they keep engaging in it, to sell not only with no reasonable profit on their investment and operation and distribution expenses—which is the general policy of the law—but at a loss of a part of their investment which deprived them of at least out-of-pocket costs. *Armour & Co.* v. *Bowles,* Em. App. 1945, 148 F. 2d 529, certiorari denied, 325 U. S. 871, 89 L. Ed. 1989, reconsideration denied 326 U.S. 806, 90 L. Ed. 491. In seeking the impact of his Order on the Continental market, the Secretary was levying on the importers, as a class, in their import and wholesale rice trade, a direct burden which was tantamount to an economic punishment for the rise in price made by the mills, a rise which, though speculative, was not unlawful, and which importers could not control once federal controls on rice ceased, in view of "the weakness in the bargaining power on [their] part." The price-regulation power does not extend to a complete regulation of trade, *People* v. *D'Esposito*, 45 N.Y.S. 2d 865 (1944) and, less so, to ruining trade or industries in general by burdening them with conditions which are onerous and detrimental to such trade or industries. *Van Der Loo* v. *Porter*, Em.App. 1946, 160 F. 2d 110, certiorari denied 329 U. S. 774, 91 L. Ed. 665.

---

[4] It appears from the record that after the effective date of Order 228, and at the opportunity given by many millers to do so, orders totalling about 240,000 hundredweights of rice were called.

We are not dealing herein with the individual case of a member of a trade or industry who suffers losses from causes other than ceiling prices in themselves, said prices being fair and equitable for the trade in general. Our case deals with an entire class, an aggregate of persons engaged in a commercial enterprise or trade who, by the inevitable effect of Order 228, were subjected to a loss—a direct and well known loss—of their investment in the trade they adopted as theirs in the prevailing private enterprise system. Notwithstanding the Secretary's foresighted action, taken in behalf of Puerto Rican consumers, in adopting the fixed or specific price policy for rice rather than the policy of markups as did the federal regulations in the continental market, his authority, and his action, could not extend, under the law, to the point of causing direct losses, without compensation, to those investments. *Van Der Loo* v. *Porter, supra.*

Bearing in mind the purpose of the Secretary, that Puerto Rican consumers would not suffer from the speculative ambitions of continental millers as well as the short period exempt from controls, he could and ought to have provided, in his Order, sufficient or ample means whereby, even without allowing them a margin of profit (markup), the importers might, at least, recover out-of-pocket costs. *Armour & Co.* v. *Bowles, supra.* Or in behalf of consumers, the State itself could have absorbed the losses which importers might suffer because of the inevitable effect of the Order on rice purchased during the period exempt from controls. The Secretary lacked authority under Act No. 228 to grant to consumers any kind of a subsidy at the expense of the importers. The less so, where, as in the case at bar, that subsidy is a charge not on gains or profits of importers, but rather on the capital invested. That is no subsidy. That is confiscation.

The facts in this case do not justify the application of the principles involved in the decisions on which the opinion of this Court is principally based. We are not con-

fronted with prices which, in the long run, might be too low, and which, under the theory of the case of *Ben H. Rosenthal & Co. v. Porter*, Em. App. 1946, 158 F. 2d 171, 173, and of the cases therein cited, reaffirmed by the Court of Appeals for the First Circuit in *Mora v. Mejías, supra*, to the effect that "Price regulations are issued not only on the basis of past experience, but also on the basis of reasonable forecasts or anticipations of future market trends. If a price regulation *is initially valid on this dual basis*, the Administrator is entitled to observe the actual results of its operation for a reasonable period of time, before a court could conclude that he was arbitrary or capricious *in not revising the established maximum prices*" (underscoring is ours) would require a waiting period in order that, observing the actual result of its operation for a reasonable period of time, they might be revised. We are here squarely confronted with investments made during a period exempt from federal or local controls and with a loss of a part of that investment resulting from prices fixed below cost. We are definitely confronted, as for the rice purchased during this period, with a price which is unreasonable and arbitrary, because, even though it is true, as the Court of Appeals states in the case of *Mora v. Mejías, supra*, that: "It is not denied [by the importers] that the maximum prices established in Administrative Order 228 were valid as applied to stocks of rice in Puerto Rico which had been bought in continental United States while millers' prices there were still subject to federal regulation", it is also true, under the same principle, that prices were initially invalid as applied to supplies of rice which, in Puerto Rico or in transit, had been bought in Continental United States during the period exempt from federal control and prior to the effective date of Order 228, at prices higher than those fixed in said Order. The principle that no person shall be deprived of his property without due process is not inconsistent with the principle, equally vital, that all property is acquired and possessed under the

implied obligation that the use and disposition thereof are not injurious to the general interest of the community. *Mugler* v. *Kansas*, 123 U. S. 623, 31 L. ed. 205. But the exercise of the price-regulating power does not include the authority to annul or repeal, by administrative fiat, the constitutional guarantee against the deprivation of property without due process of law. The valid exercise of this power is subject to standards consistent with such constitutional guarantee. That is why the law requires that the price should be "generally fair and equitable." This standard does not carry with it an ethereal concept and, hence, can not be applied in a vacuum. It is linked to the reality itself of the condition and development of the industry or trade in general. And though, in the exercise of that power, and pursuant to such standards, the state does not guarantee a profit to each individual producer, *Bowles* v. *Willingham*, 321 U.S. 503, 88 L. Ed. 892; *Counselman* v. *Fleming*, Em. App. 1947, 161 F. 2d 203, certiorari denied 331 U. S. 861, 91 L. ed. 1867; *Chippewa County Co-Op. Dairy* v. *Clark*, Em. App. 1947, 163 F. 2d 753; *Weisel & Co., Inc.* v. *Bowles*, Em. App. 1946, 156 F. 2d 1007; *VanLandingham* v. *Clark*, Em. App. 1947, 163 F. 2d 896; *Ben H. Rosenthal & Co.* v. *Porter, supra; Birtcherd Dairy* v. *Bowles*, Em. App. 1946, 156 F. 2d 1004, it should not be lost from sight that the law pursues the protection not only of the consumers, but also of those persons engaged in commerce. *White Trimming House* v. *Porter*, Em. App. 1946, 154 F. 2d 113; *Philadelphia Coke Co.* v. *Bowles*, Em. App. 1943, 139 F. 2d 349, 355. Price control is directed against unjustified rises in the price of basic goods, speculative practices and inflation, so as to protect the economy against disruptures or total collapse.

The principle that when an industry is subject to seasonal fluctuations in regard to its most important cost item the reasonableness of the established maximum prices must be viewed with reference to the complete cycle of the fluctua-

tions and not with reference solely to the period of the cycle when the costs were highest, does not come into play herein. *Counselman* v. *Fleming, supra.* We are not facing here a local control of prices at the production level, but rather at the sale and distribution level, affected by the original cost at prices out of local control; and, to apply said principle, the complete cycle in the continent would be represented by the annual crop of rice. It is particularly the 1952–53 crop the one which was subjected to federal control and later on decontrolled. The cycle, if it exists, includes that crop, and it is as to the rice from such crop that, because of the initial effect of Order 228, the Puerto Rican importers suffered a loss in their investments.

The Secretary could and ought to have anticipated— because he was in a better position than the importers to do so—that as a result of flooding the Puerto Rican market with rice from the 1953–54 crop mainly from the southern States, the importers would not only suffer a loss caused by the maximum price established in the Order as to rice bought at a time when there were no controls, but would probably suffer a higher loss by not being able to sell it even at said maximum.

It has been stated that the provisions of the Federal Emergency Price Control Act of 1942 are infused by its far-reaching aims, but the argument about inflationary pressures on price control cannot be used to give to said provisions a meaning other than that which the language in the context of the legislative history of each Section yields. *Thomas Paper Stock Co.* v. *Porter*, 1946, 328 U. S. 50, 90 L. Ed. 1078. The statute was not adopted to hamper or penalize legitimate business, but rather to protect the public, in time of emergency, "against avarice of uncontrolled human nature." *Alpert* v. *Grenlee*, 1944, 148 P.2d 777. It is reasonable to believe that, in making use of the fixed or specific price policy in establishing in his order maximum prices for sales of rice in Puerto Rico equal to those fixed

by federal regulations and authorized under the markup policy, the Secretary estimated that the price fixed for millers in said federal regulations was an indication that it included a reasonable profit. But as Order 228 could have no legal effect in the continent, and there was no federal control, the initial stage in the sales by millers was subject to the rise that a free market might bring about and subject to the economic effect on the millers of a dwindling Puerto Rican market—an effect which might have been foreseen if the local control would have become effective at the same moment in which federal control ceased—and as Puerto Rican importers had already purchased rice during the period exempt from controls, at prices in that free market which were higher than those established in the Order, without the latter providing any means whereby the importers might recover out-of-pockets cost, *Armour & Co.* v. *Bowles, supra,* said Order 228, as applied to the petitioners with regard to such property, is arbitrary and unreasonable.

This Court penalizes the importers because in August and September 1952 they contracted with the millers for purchases at an open price in the market "in the face of prospective local controls" and because the risks of an increase in price once federal controls ceased "were deliberately undertaken" by the importers. If the finding of the Secretary as to the "weakness in the bargaining power on the part of the Puerto Rican importers" were correct, I believe that the aforesaid premise is neither proper nor its application fair. In the role of a "good prophet" the Secretary was in a better position than the importers to take timely measures which might insure the necessary stability in the commercial relations between Puerto Rico and the continent in behalf of the consumers. He could anticipate his Order, so that it might serve as a warning to millers, if not because of its legal consequences, because of its economic consequences, due to a dwindling local market.

This opinion is based not on the subordination of the price-regulating power to existing contracts [5] but rather on a condition of facts already consummated and known to the Secretary when he promulgated his order. In the exercise of its price-regulating power, the State cannot do indirectly what it cannot do directly in the exercise of its other sovereign powers. There is no constitutional provision, nor democratic principle, authorizing the State, through the exercise of such power, to convey property belonging to a group of citizens—here named as importers—to another group of citizens—here named as consumers—under conditions which are tantamount to an unlawul confiscation of property, the less so, by a deprivation of their rights of liberty through a coercitive statute; and the less so, where such right of liberty is dependent on a degree of certainty in the prophecies of a public officer.

As I heretofore stated, the immediate legal consequences of the present suit are confined to the effect of such suit on the criminal prosecutions pending in the Superior Court. It is my opinion that, in order to obtain valid convictions therein, the State must allege and prove that the specific sale charged in each case as violative of Order 228 was not made of the rice purchased during the period exempt from federal and local control. The exemption which, as to this rice, should have been included in said Order—so that it might have been initially valid as applied to the importers—should

---

[5] Under the theory of this opinion, it need not be considered here whether or not the contracts entered into by millers and importers, as far as the latter are concerned, were validly affected by the effect of Order 228 and subordinated to the public policy which the Order enforced, *Brewing Corporation of America* v. *Cleveland Trust Co.*, 185 F. 2d 482, C. A. 6th, 1950; *Cobleigh* v. *Woods*, 172 F. 2d 167, certiorari denied 337 U. S. 924, 93 L. Ed. 1732; *Seminol Rock & Sand Co.* v. *Fleming*, Em. App. 1947, 160 F. 2d 42; *Philadelphia Cocke Co.* v. *Bowles*, *supra*; and whether or not the clause to the effect that purchasers were bound to buy at "open" price in the market at the time of delivery in the port of origin, rendered the police power of the state immune from price control regulations under Act No. 228.

442

be considered as part of the Order and of the definition of the offense charged, and, consequently, the State must allege and prove that the violation charged does not come within the exemption. That is the rule of law applicable under the theory of this opinion.

Order 228, in fact, blocked petitioners, as heretofore stated, from recovering out-of pocket costs. For having attempted to recover what was duly theirs—and not theirs by being inclined to speculation—they have been criminally prosecuted. Having paid to the millers the rise in price prevailing during the period short of all controls, the Puerto Rican importers should not pay also, at the extra price of their personal liberty, either for the speculative practices of the continental millers or for the state's delay in its intent to keep in check such practices through the indirect economic impact of Order 228.