ENRIQUE MORA y demás importadores de arroz de Puerto Rico, peticionarios, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, Sala de San Juan, HON. E. SANTANA BECERRA, JUEZ, demandado; ADMINISTRACIÓN GENERAL DE SUMINISTROS, etc., interventores.

Número 2045.

*Sometido:* 4 de diciembre de 1953. *Resuelto:* 14 de mayo de 1954.

450

*James R. Beverley, R. Castro Fernández* y *F. Castro Amy,* abogados de los peticionarios; *Hon. Secretario de Justicia José Trías Monge* y *Edgar S. Belaval, Procuradores Auxiliares,* abogados de los interventores; *M. Avilés Bracero,* por la Federación de Comercio de Puerto Rico, como *amicus curiae.*

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del tribunal.

El 12 de marzo de 1953 el Secretario de Agricultura y Comercio de ·Puerto Rico expidió la Orden Administrativa

núm. 228, para tener efecto el 16 de dicho mes, fijando el precio máximo para la venta de arroz en Puerto Rico, de conformidad con la autoridad conferídale por el artículo 3 de la Ley núm. 228, Leyes de Puerto Rico, 1942 ((1) pág. 1269), según fué enmendada por la Ley núm. 234, Leyes de Puerto Rico, 1950 ((1) pág. 597). Los importadores de arroz en Puerto Rico radicaron una moción de reconsideración de la Orden núm. 228, a tenor con el artículo 11 de la Ley núm. 228. Sobre la moción de reconsideración se celebró una vista en la que se presentó testimonio. Luego el Secretario declaró sin lugar la moción de reconsideración.

Los importadores radicaron ante el Tribunal Superior una solicitud de revisión de la Orden del Secretario a tenor con el artículo 12 de la Ley núm. 228.([1]) El Tribunal Superior dictó sentencia confirmando la Orden núm. 228. A virtud del referido artículo 12, expedimos auto de *certiorari* para revisar la sentencia del Tribunal Superior.([2])

Los importadores también radicaron petición de *injunction* ante la Corte de Distrito de los Estados Unidos para Puerto Rico para que se prohibiera al Secretario poner en vigor la Orden Administrativa núm. 228. Después de que se le presentara evidencia y de oír a las partes, dicha Corte declaró sin lugar la moción de los importadores para que se expidiera un *injunction* preliminar. *Mora* v. *Torres*, 113 F.Supp. 309 (Dist. Ct., Puerto Rico, 1953). Los importadores apelaron de la sentencia de la Corte de Distrito de los Estados Unidos, la cual fué confirmada por la Corte de Apelaciones para el Primer Circuito. *Mora* v. *Mejías*, 206 F.2d 377 (C. A. 1, 1953).

---

([1]) A virtud de la sección 13(a)1 de la Ley núm. 11, Leyes de Puerto Rico, Sesiones Extraordinarias, 1952 (pág. 31), la revisión judicial de tales órdenes compete al Tribunal Superior y no a la anterior Corte de Apelaciones de Suministros.

([2]) Durante el curso de los procedimientos, la Administración de Estabilización Económica de Puerto Rico y el Administrador de ésta fueron sustituídos como demandados.

Las opiniones del Tribunal Superior, de la Corte de Distrito de los Estados Unidos y de la Corte de Apelaciones contienen todas detalladas relaciones y conclusiones de hecho. Es innecesario exponer nuevamente las conclusiones de hecho del Tribunal Superior, las cuales hacemos nuestras. La cuestión, según llega el caso ante nos, es limitada. Debido al hecho de que han bajado en los Estados Unidos continentales los precios pagados por los importadores de arroz, los peticionarios admiten ahora que la Orden Administrativa núm. 228 ha sido válida durante varios meses. Sin embargo, sostienen que la Orden fué inválida durante los meses de marzo, abril, mayo y junio, 1953, en cuanto al arroz comprado por ellos en los Estados Unidos continentales durante dicho período bajo contratos de precio en el mercado, por el cual pagaron precios más altos que los fijados en la Orden núm. 228 como el precio máximo de venta en Puerto Rico. ([3])

En *Mora* v. *Mejías*, supra, la Corte de Apelaciones hizo un comentario que es pertinente a esta contención de los peticionarios. Dijo a las págs. 384–5:

"El demandante aparentemente supone que la Orden Administrativa núm. 228 ha sido concluyentemente tenida por arbitraria o caprichosa, y por inconstitucional, porque, según halló probado la corte inferior, el demandante tenía a mano cierta cantidad de arroz que había importado a Puerto Rico a un precio por quintal más alto que los precios al por mayor fijados en la orden. Esto no es necesariamente así, aunque desde luego, el administrador no puede esperar conferirle indefinidamente un subsidio a los habitantes de Puerto Rico a expensas de los importadores de arroz.

"      .      .      .      .      .      .      .

"No se niega que los precios máximos establecidos en la Orden Administrativa núm. 228 eran válidos en tanto en cuanto se aplicaban a las existencias de arroz en Puerto Rico que habían sido compradas en los Estados Unidos continentales mien-

---

([3]) Bajo estos contratos de precio en el mercado los importadores venían obligados a pagar el precio en el mercado prevaleciente en los Estados Unidos continentales a la fecha de cada embarque, más cualquier aumento en flete o seguro, C.I.F. San Juan.

tras los precios de los molinos allá estaban todavía sujetos a reglamentación federal. Hasta donde surge del récord, el administrador pudo haber tenido algún motivo para anticipar que el alza en los precios de los molinos, que sobrevino inmediatamente que se levantaron los controles federales, era cosa pasajera, y que los costos de los importadores, en las operaciones normales del mercado, bajarían pronto a los niveles consistentes con transacciones ventajosas a los precios al por mayor fijados en la orden. Hasta donde sepamos, el administrador muy bien pudo haber tenido también motivos para anticipar que los precios al por mayor fijados en la orden, tendrían, por sí mismos, alguna tendencia a evitar la inflación desmedida en los precios de los molinos en los Estados Unidos continentales debido a la importante participación que tiene Puerto Rico en el mercado de exportación. *Cf. Great Atlantic & Pacific Tea Co.* v. *Porter,* Em.App. 1946, 156 F.2d 812."

Tanto la Corte de Apelaciones como el Administrador probaron ser buenos profetas. Todas las partes interesadas convienen ahora en que el aumento en los costos de los importadores han bajado "a los niveles consistentes con transacciones ventajosas a los precios al por mayor fijados en la orden." Los peticionarios, sin embargo, nos piden que resolvamos que la Orden núm. 228 fué nula durante el corto período en que hubo un "alza . . pasajera" que resultó en el aumento en los precios de los molinos, y que la Orden se tornó válida solamente desde la fecha en que los precios en los Estados Unidos continentales bajaron a un nivel más bajo que los precios fijados en la Orden núm. 228.

No podemos convenir con esta contención de los peticionarios. "La norma estatutaria, según se expresa en la ley local, que adopta el lenguaje de la Ley de Emergencia sobre Control de Precios de 1942 y el de la Ley de Producción para la Defensa de 1950, es que la reglamentación del precio debe ser 'generalmente justa y equitativa', y que a juicio del administrador sea una norma que lleve a cabo los fines de la ley." *Mora* v. *Mejías,* supra, pág. 384. La confirmación de su criterio bajo la norma estatutaria hace que la orden del Admi-

nistrador, bajo las circunstancias de este caso, sea válida más bien que nula *ab initio*. Así lo hizo constar claramente la Corte de Apelaciones en su opinión en el caso de *Mora*, a las págs. 385-6:

"Es cosa sabida, como se dijo en el caso de *Ben H. Rosenthal & Co., Inc.* v. *Porter*, Em.App. 1946, 158 F.2d 171, 173, 'que los precios máximos en un reglamento originalmente válido pueden tornarse inválidos debido a un cambio significativo de los factores económicos; y viceversa.' *Pero una reglamentación sobre precios no oscila entre la validez y la invalidez dependiendo sobre variaciones diarias en los factores del mercado. Son las variaciones de largo alcance las que son significativas a este respecto.* La reglamentación sobre precios se fija no solamente a base de experiencia pasada, si que también a base de predicciones o anticipaciones razonables de futuras variaciones en el mercado. Si un reglamento de precios es inicialmente válido sobre esta base dual, el administrador tiene derecho a observar los resultados de su funcionamiento durante un período razonable, antes de que un tribunal pueda llegar a la conclusión de que fué arbitraria o caprichosa su actuación al no revisar los precios máximos fijados. Véanse *Ben H. Rosenthal & Co., Inc.,* v. *Porter,* supra, 158 F.2d a la pág. 174; *Superior Packing Co.* v. *Clark,* Em.App. 1947, 164 F.2d 343, 352. Esto es especialmente cierto con respecto a un producto históricamente sujeto a fluctuaciones de precios por temporadas. Véase *Counselman* v. *Fleming,* Em.App. 1947, 161 F.2d 203, 205-206, *certiorari* denegado 1947, 331 U. S. 861, 67 S.Ct. 1756, 91 L. Ed. 1867. Véase también *Gillespie-Rogers-Pyatt Co., Inc.* v. *Bowles,* Em.App. 1944, 144 F.2d 361." (Bastardillas nuestras.)

En el caso de *Ben H. Rosenthal & Co.* v. *Porter,* 158 F.2d 171 (Em.App. 1946) la Corte indicó que la norma es si el Administrador actuó razonablemente a la fecha de la orden. Dijo la Corte a la pág. 173:

". . . Es posible, desde luego, que los precios máximos en un reglamento originalmente válido pueden tornarse inválidos debido a un cambio significativo de los factores económicos; y viceversa. Al hacer una declaración retrospectiva sobre la validez de un reglamento en alguna fecha pasada, este tribunal no debe visualizar el caso desde el punto ventajoso de lo ya ocurrido.

Si, por ejemplo, se acusa criminalmente a un vendedor por haber hecho una venta a sobreprecio el 15 de diciembre de 1943, y el problema es si el reglamento era válido en dicho día, tenemos que proyectar atrás nuestro pensamiento hacia la situación económica prevaleciente el 15 de diciembre de 1943, y decidir si el Administrador tenía entonces, consistentemente con las normas estatutarias, una base racional para mantener en vigor el reglamento a la luz de la información que para aquel entonces tenía a mano y a la luz de la predicción razonable, en dicha fecha, del probable impacto del reglamento en su funcionamiento." (⁴)

"En un caso específico puede ser muy difícil para nosotros determinar la fecha exacta en que un reglamento, válido en su origen, se convirtió en inválido debido a acontecimientos posteriores." *Superior Packing Co.* v. *Clark*, 164 F.2d 343, 353 (Em.App., 1947). En igual forma puede también ser difícil, bajo otras circunstancias, determinar la fecha exacta en que una orden para vender bajo costo se torna válida por la confirmación de la creencia razonable del Administrador de que los costos al vendedor disminuirán. Pero aquí nada encontramos en autos que nos permita decir que la fijación de un precio de venta por debajo del costo por un período tan corto fué arbitraria y caprichosa aun a la fecha de su comienzo. Por el contrario, los acontecimientos parecen demostrar que por haber actuado con firmeza durante un corto período de tiempo, el Administrador jugó un papel importante para evitar "la inflación desmedida en los precios de los molinos en los Estados Unidos continentales debido [entre otras cosas] a la importante participación que tiene Puerto Rico en el mercado de exportación." *Mora* v. *Mejías*, supra, pág. 385. La actuación del Administrador encuentra apoyo en lo siguiente: (1) los precios fijados por él eran sustancialmente los mismos que los fijados bajo controles federales que habían cesado poco antes de que la Orden núm. 228 empezara a regir; (2) la Orden fué expedida en un momento en que la cosecha de 1952–53 ya se había recogido, todos los

---

(⁴) Véase Hyman y Nathanson, *Judicial Review of Price Control: The Battle of the Meat Regulations*, 42 Ill.L.Rev. 584.

gastos envueltos en la misma habían sido incurridos, y dicha cosecha se estaba vendiendo a los mismos precios bajo controles federales; (3) los contratos a precio en el mercado que obligaban a los importadores a pagar aumentos en los precios del mercado continental eran una nueva práctica bajo la cual tales riesgos fueron deliberadamente asumidos frente a los prospectivos controles locales, y aun bajo estas circunstancias a los importadores en muchos casos se les brindó la oportunidad de cancelar estos contratos. En vista de lo anterior, no podemos decir ahora, mirando hacia atrás, de los autos ante nos, que la Orden núm. 228 fué nula desde la fecha de vigencia el 16 de marzo, 1953 hasta el mes de julio de 1953. A la luz de todas las circunstancias que rodean esta orden específica, resolvemos que la Orden Administrativa núm. 228 era válida desde el 16 de marzo de 1953.

■ Lo que hemos dicho resuelve los dos primeros errores al efecto de (1) que la Orden núm. 228 es arbitraria, caprichosa y contraria a la Ley núm. 228, y (2) que la Orden infringe las cláusulas del debido procedimiento de las Constituciones del Estado Libre Asociado y de los Estados Unidos. El tercer señalamiento es al efecto de que la corte sentenciadora cometió error al no declarar con lugar la moción de los peticionarios para reabrir el caso después de dictarse sentencia, con el fin de permitirles presentar nueva evidencia sobre el efecto económico de la Orden Administrativa núm. 228. La resolución del tribunal sentenciador negándose a reabrir el caso para dicho fin dice en parte como sigue:

"La evidencia adicional ofrecida está sintetizada bajo juramento en la solicitud de 18 de agosto, al efecto de que gran parte del arroz recibido por los demandantes durante los meses de junio y julio al precio de $12.25 quintal no ha podido ser vendido al precio de $12.90 autorizado por el Administrador debido a que las existencias anteriores de arroz pagado a $13.25 aún no se han vendido en su totalidad; que todas las probabilidades son de que el arroz tenga que venderse a mucho menos de $12 el quintal debido a que el arroz de la nueva cosecha próximo a recibirse se

está comprando a menos de $10 CIF San Juan; que mientras siga bajando el precio del arroz en el mercado suplidor menos oportunidad tienen los demandantes de vender el arroz objeto de este litigio afectado por la Orden 228 a un precio igual o mayor que su costo debido a la competencia, y a la regla económica de oferta y demanda; y que por razón de la continua baja del precio del arroz, los demandantes perderían para siempre la oportunidad de recuperar la pérdida inicial que alegan les ocasionó la Orden Administrativa 228.

"El problema que plantean los demandantes y para lo cual han solicitado se les permita introducir evidencia adicional puede simplificarse de la siguiente manera: Que debido a la inundación del mercado con arroz comprado a precio mucho más bajo, sin que hubieran salido de las existencias de arroz que compraron a $13.25 y $12.45, sobre el máximo fijado por la Orden Administrativa 228, por la fuerza de la ley económica de oferta y demanda y de la competencia ellos tendrán que vender arroz sin hacer uso siquiera del precio máximo fijado por el Administrador y por debajo de dicho precio máximo, a menos que como expresaran en la vista de su solicitud, se combinaran y se pusieran de acuerdo para vender el arroz al precio máximo autorizado.

"Como podrá observarse el problema económico que afrontan los demandantes con motivo de la subsiguiente baja en el precio del arroz es uno que no se les resuelve ya dejando sin efecto la Orden 228 o anulándola. La Orden 228 fija precios máximos y no precios mínimos. Los propios demandantes manifiestan que la situación de mercado es tal que ni siquiera podrían vender el arroz al límite máximo autorizado. Esta situación, ni la ha creado la Orden 228 ni es la consecuencia de dicha Orden."

Convenimos sustancialmente con el criterio del tribunal sentenciador. Compete a cada importador individual resolver el problema de cuán bajo o cuán alto debe ser el precio a cobrarse por él bajo las circunstancias concurrentes a fin de realizar una ganancia sobre sus existencias de arroz considerando conjuntamente todas sus transacciones. Todos los importadores aparentemente están sustancialmente en la misma posición: tienen algunas existencias a mano compradas a costos mayores que los precios fijados en la Orden núm. 228; también están recibiendo existencias compradas a precios

considerablemente más bajos. No podemos ver cómo el tribunal sentenciador podía atarle las manos al Administrador en este asunto dándole crédito decisivo al testimonio de importadores que pretenden representarlos a todos, al efecto de que todos ellos inexorablemente vienen obligados ahora, debido a la competencia, a vender todas sus existencias a un precio tan por debajo del precio fijado en la Orden, que nunca se resarcirían de toda o parte de la pérdida ocasionádales en aquella porción de su existencia que fué comprada a precios más altos que los fijados por la Orden núm. 228. Es difícil creer que los importadores se propongan seguir todos una norma de conducta tan poco favorable a sus intereses. Pero aun cuando fuere digno de crédito este testimonio, la situación sería creada por ellos mismos y no por la Orden del Administrador, que les permite vender sus existencias a un precio más alto que el que existe en el mercado actualmente. No podemos decir que el tribunal sentenciador abusara de su discreción al negarse a reabrir el caso después de haber dictado sentencia a los fines de admitir dicho testimonio.

◼ Los peticionarios arguyen en su cuarto error que la Orden núm. 228 infringe la cláusula de comercio de la Constitución Federal. Este punto ha sido ya resuelto en su contra por la Corte de Apelaciones en el caso de *Mora* v. *Mejías*, supra. Dijo la Corte a la pág. 387, escolio 6: "Es interesante indicar que el apelante en este caso interpuso un argumento constitucional por separado al efecto de que la Orden Administrativa núm. 228 constituyó una carga indebida e inconstitucional sobre el comercio interestatal. Con el fin de evitar decisiones como la del caso de *Buscaglia* v. *Ballester*, 162 F.2d 805, (1er. Cir., 1947), al efecto de que la implicación de la cláusula de comercio de la Constitución Federal no operaba como una limitación sobre la Asamblea Legislativa territorial de Puerto Rico, según establecida bajo la Carta Orgánica de 1917, el apelante sostiene que el 'nuevo *status*' del actual Estado Libre Asociado de Puerto Rico cae dentro

del concepto de un Estado dentro del alcance de decisiones que resuelven que un Estado no puede indebidamente imponerle cargas al comercio interestatal. En el cuerpo de nuestra opinión no consideramos este argumento constitucional por separado con respecto a la cláusula de comercio, toda vez que la reglamentación local de precios por un Estado, de ser válida por todo otro concepto, no queda inválida por motivo de algún efecto incidental que pueda tener sobre el volumen del comercio interestatal."

El quinto error señalado es que la Orden núm. 228 menoscaba las obligaciones contractuales de los peticionarios, en violación de las Constituciones Federal y de Puerto Rico. Convenir con los peticionarios sobre este punto equivaldría a destruir toda posibilidad de un eficaz control de precios. Los vendedores podrían sencillamente otorgar contratos proveyendo para precios en el mercado o para aumentos posteriores. Fuera del hecho de que muchos de ellos tuvieron la oportunidad, que rechazaron, de cancelar sus contratos, éstos fueron otorgados sujetos a las posibilidades de un futuro control de precios. *Mercado* v. *Brannan*, 173 F.2d 554 (C.A. 1, 1949); *Philadelphia Coke Co.* v. *Bowles*, 139 F.2d 349, 357 (Em.App., 1943); *Taylor* v. *Brown*, 137 F.2d 654, 659 (Em.App., 1943); *Méndez* v. *Jiménez, Comisionado*, 72 D.P.R. 335, 340; *Sierra, Comisionado* v. *San Miguel*, 70 D.P.R. 604. El quinto señalamiento carece de méritos.

*Se anula el auto expedido.*

El Juez Asociado Sr. Ortiz no intervino.

---

Opinión disidente del JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ.

Este caso ha dejado de ser uno en el que se litigan derechos de propiedad para convertirse en uno en el que se reclaman derechos de libertad. No queda desvirtuada esta realidad por el hecho de que para proteger estos últimos haya que reconocer los primeros. La utilidad práctica del presente re-

curso ha quedado circunscrita a examinar los méritos de la impugnación, por los peticionarios, de la Orden 228 de 12 de marzo de 1953 del Secretario de Agricultura y Comercio de Puerto Rico, y sus efectos en multitud de procesos criminales seguidos en su contra y pendientes en el Tribunal Superior. De hecho, su única virtualidad consiste en ofrecer a los peticionarios el foro de última instancia para el planteamiento —por vía de defensa en dichos procesos criminales—de la nulidad de la Orden 228, defensa de la cual, por no aparecer el vicio de la alegada nulidad de la faz de dicha Orden, tan sólo pueden valerse siguiendo, como lo hicieron, el procedimiento estatutario autorizado por la Ley núm. 228 de 12 de mayo de 1942 ((1) pág. 1269), en sus artículos 11 y 12. *Yakus* v. *United States*, 321 U. S. 414, 88 L. ed. 834; *Ruiz* v. *Corte*, 71 D.P.R. 384.

Las severas penalidades impuestas por la citada Ley 228, según quedó enmendada en su artículo 13(*b*) por la núm. 493 de 29 de abril de 1946 ((1) pág. 1475), según enmendada por la núm. 31 de 15 de septiembre de 1950 (Leyes 1950–51, pág. 249), a cualquier persona a quien se halle culpable de la violación de una escala de precios—cárcel por un término no menor de 30 días ni mayor de 2 años *y además* multa no menor de 100 dólares ni mayor de 10,000, con prisión subsidiaria de un día de cárcel por cada dólar que dejare de pagar (sin exceder de 90 días según el artículo 54 del Código de Enjuiciamiento Criminal) y sin los beneficios de ley alguna que permita la suspensión de sentencias—hacen necesario el más detenido examen de las cuestiones aquí envueltas.

Convengo en que "La norma estatutaria, según se expresa en la ley local, que adopta el lenguaje de la Ley de Emergencia sobre Control de Precios de 1942 y el de la Ley de Producción para la Defensa de 1950, es que la reglamentación del precio debe ser 'generalmente justa y equitativa', y que a juicio del Administrador sea una norma que lleve a cabo los fines de la ley" *Mora* v. *Mejías*, 206 F.2d 377, 384. Pero en este caso

hay factores que, *en virtud de la propia norma estatutaria* que rige el ejercicio por el Administrador del poder en él delegado por la Asamblea Legislativa, y de la esfera hasta donde alcanza el poder del Estado sobre reglamentación de precios, hacen nula, en su aplicación a los peticionarios en parte de su propiedad, la referida Orden 228.

Según aparece de autos([1]) el Secretario utilizó, al fijar los precios máximos al arroz en la Orden 228 el sistema de precios fijos y no el sistema de beneficio sobre el costo (*mark-up*).

---

([1]) En el *Exhibit* 30 en autos, titulado "Statement of Economic Data and other Facts of which the Administrator has taken Notice", de 24 de junio de 1953, aparece lo siguiente, pág. 2:

"2. Precios Fijos, la Mejor Técnica para un Eficaz Control de Precios en Puerto Rico.

"El sesenta por ciento de la población de Puerto Rico vive en los campos. Allí la familia típica consiste de 5.2 miembros y recibe un ingreso anual de $550 en efectivo. En otras palabras, el ingreso anual en efectivo por cabeza es de alrededor de $106. El nivel educativo de la población rural adulta es de cuarta categoría.

"A tenor con el Censo sobre Negocios de 1950, había 16,747 establecimientos de venta de productos alimenticios al detal con un volumen de negocio anual promedio, según información suministrada, ascendente a $6,515. Además, existe un sistema de distribución de alimentos muy complicado y costoso, que discurre desde el importador al mayorista al mayorista-detallista a grandes detallistas a pequeños detallistas.

"Estos hechos fuerzan la conclusión de que los precios fijos, y no los precios de fórmula, es la única técnica adecuada para un eficaz control de precios en el Estado Libre Asociado.

"Ambas agencias federales, la Oficina de Administración de Precios y la Oficina de Estabilización de Precios, han recurrido siempre a esta técnica, siempre que ha sido posible, especialmente en el caso de los artículos de primera necesidad.

"Existe un ejemplo reciente muy bueno bajo la OAP en el caso del bacalao, del uso de precios máximos fijos de un artículo de primera necesidad importado de un país de origen cuando no existe control de precios. En el verano de 1952, luego de haber concedido aumentos en el precio del bacalao que venía del Canadá y de Terranova el año anterior, los exportadores pidieron un aumento adicional de tres centavos la libra sobre el precio. En ninguno de los dos países extranjeros había control de precios. Después de que la oficina local, la regional y la nacional de la OEP estudiaron el problema, se resolvió que el aumento a ser concedido sería solamente de un centavo y medio. Durante dos meses la Asociación de Terranova de Exportadores de Pescado no efectuaron embarques de bacalao a Puerto Rico por el fundamento de que el precio máximo al por mayor era muy bajo.

Es evidente que el principal objetivo del Secretario al utilizar el sistema de precios fijos, y no el de beneficios sobre el costo (*mark-up*), en su Orden 228 estableciendo la escala de precios máximos al arroz, fué el de evitar que el consumidor puertorriqueño sufriera los efectos de las prácticas especulativas del arrocero continental. Hasta el 25 de febrero de 1953, fecha de cese del control federal, el sistema utilizado por la agencia federal correspondiente era precisamente el de margen de beneficio sobre el costo (mark-up), por el cual se autorizaba a los importadores un beneficio de 84 centavos en el arroz superior y de 73 centavos en el de inferior calidad, por saco de 100 libras. Este sistema, bajo el control federal, no creaba perjuicio alguno para el consumidor puertorriqueño, ya que el poder federal de reglamentación llegaba a todos los niveles de producción y venta, y bajo dicho control los molinos no podían vender a precio más alto que el fijádosele a ellos por dicha reglamentación, y los impor-

Luego de transcurridos los dos meses no pudieron sostener más la situación y volvieron a efectuar los embarques al Estado Libre Asociado.

"Ese fué también el caso en 1951 con respecto a la carne en cuartos importada de la República Dominicana. En este caso el matadero de la República Dominicana no hizo embarques durante un año porque le fué posible enviar sus embarques a los Estados Unidos continentales. En este caso el precio máximo al por mayor establecido por la OEP era de 35 centavos frente a 40 centavos que era lo que se pedía.

"La norma de establecer márgenes de beneficio solamente cuando el aumento en el costo en la fuente abastecedora fuera del Estado Libre Asociado es pasado al consumidor a través de los canales de distribución, sería un control de precios bastante liberal a los fines de la estabilización de la economía y más bien sería un simple control de los negocios. Puerto Rico tiene una economía abierta. Nuestro bienestar depende del mantenimiento de nuestros términos comerciales. Las extraordinarias condiciones mundiales del presente y la debilidad del poder de contratación de parte de los importadores puertorriqueños, son influencias que constantemente amenazan deteriorar nuestros términos de comercio. El arroz es un buen ejemplo de esta situación. Debemos tomar todas las medidas necesarias para evitarlo.

"De conformidad con 'Agricultural Prices', publicación oficial del Departamento de Agricultura de los Estados Unidos, de abril de 1953, nunca antes había estado el azúcar tan cerca del precio de paridad—$7.95 la tonelada [sic] comparado con $8.32 precio de paridad—pero aun todavía bajo el precio de paridad 95.5% del precio de paridad. Por otro lado, el precio del arroz en abril de 1953 era de 130% del precio de paridad.

"Los salarios de los trabajadores de la caña—la proporción más grande

tadores, así como los demás intermediarios, podían obtener el beneficio autorizado.([2])   Al utilizar el sistema de precios fijos en la reglamentación local actuó sabiamente el Secretario, pues el alza en el precio del arroz por los molinos se produjo inmediatamente de cesar la reglamentación federal, y los importadores puertorriqueños—quienes realmente constituyen los primeros intermediarios entre los productores y los consumidores—tenían que comprar a los precios de un mercado sin controles, y sin otra protección que "la debilidad del poder de contratación de [su] parte".   Véase nota (1).

Sin embargo, el Secretario—previsor como fué al utilizar el sistema de precios fijos—dejó de serlo en otros dos extremos:   (1) al no promulgar su Orden con suficiente anticipación para que comenzara a regir en el mismo instante de desaparecer el control federal, evitando así, por el impacto económico si no por el efecto legal de dicha Orden, el aumento en el precio a los importadores puertorriqueños, y (2) al

---

de obreros agrícolas en una economía agrícola—marchan unidos, por determinación del Departamento de Agricultura de los Estados Unidos, al precio del azúcar.  Si los precios del azúcar (los que nosotros recibimos) no suben lo mismo que suben los precios en el continente (los precios que pagamos), se causaría una seria desorganización en los términos de comercio y a la larga en el balance de los pagos.  Los efectos de tal desequilibrio no son instantáneos; son acumulativos debido al sistema de crédito que prevalece en el nivel al detal en el Estado Libre Asociado.  Los consumidores se comprometen a pagar precios aun cuando éstos a la larga no puedan pagarse.  Las normas de los presupuestos para vivir, especialmente en los renglones de alimentos, no pueden estirarse mucho más.  El colapso es inevitable."  (Original en inglés.  Traducción nuestra.)

([2]) En el exhibit a que se hace referencia en la nota (1), supra, y bajo el párrafo 4 titulado "Movimiento de los Precios del Arroz", el Secretario hace constar lo siguiente: Antes de Corea, el arroz perla de California, no más de 15% partido, era vendido a Puerto Rico a $7.90 el quintal.  Agregando a este precio la suma de 35 centavos por quintal para enriquecimiento, obtenemos un precio total de $8.25 por quintal.  Este precio gradualmente subió a $11 por quintal.  Para fines de 1952 el precio del arroz subió a $11.25.  En enero de 1953 el precio era de $12 por quintal.  Este fué el último precio autorizado por la Oficina de Estabilización de Precios.  Después que el control de precios fué suspendido, el precio del arroz fué subido a $13.25 el quintal.  Fué en este momento que el Gobierno del Estado Libre Asociado emitió la Orden Administrativa núm. 228 fijando precios al arroz en sus diferentes escalas de distribución."  (Original en inglés. Traducción nuestra.)

pasar por alto una realidad de hecho y de derecho que él conocía: que entre la fecha de cese del control federal sobre el arroz—control que se extendía a todos los niveles de producción y venta—25 de febrero de 1953, y la fecha de vigencia de su Orden 228, 16 de marzo de 1953, hubo un período, aun cuando breve, sin control alguno, ni federal ni local, y que en ese período, los importadores puertorriqueños compraron arroz a precios más altos([3]) que los fijados luego por él en la Orden 228 estableciendo los precios máximos.

Partiendo de la realidad de hecho y de derecho que dejamos apuntada—que los importadores puertorriqueños habían comprado existencias de arroz en el período exento de control federal y local, y que esos precios eran más altos que los que fijó luego la Orden 228 en su escala de precios—la cuestión se reduce, en el presente recurso, a determinar si en el uso de sus poderes bajo la Ley 228 de 12 de mayo de 1942, según enmendada, podía el Secretario disponer que cualquier venta de dichas existencias estaba sujeta a los precios máximos por

---

([3]) Las compras correspondientes a ese período exento de control quedaron consumadas al ser puesto el arroz objeto de cada una de ellas en el puerto de origen, a bordo del barco que habría de conducirlo a la isla. El precio de venta era el prevaleciente en el mercado, $13.25 para el arroz con no más de 15% partido, más cargos por seguro y flete (C.I.F.). Desde ese momento—fecha de entrega del arroz en el puerto de origen—el título de propiedad pasó a los compradores.

Un contrato de venta "C.I.F." es uno para la venta y entrega de la mercadería a un precio que incluye el costo de ésta, el seguro y los gastos de flete hasta el sitio de entrega, y a menos que surja lo contrario del propio contrato, el vendedor cumple su parte en el mismo cuando entrega la mercadería en el sitio de origen desde el cual va a transportarse, paga el flete desde allí al sitio de entrega y le envía al destinatario los documentos correspondientes a dicho embarque, la póliza y el recibo del pago del flete. *Thames & M. M. Ins. Co.* v. *United States*, 237 U. S. 19, 59 L. Ed. 821; *Seaver* v. *Lindsey Light Co.*, 233 N. Y. 273, 135 N. E. 329, 330. El título de propiedad de la cosa objeto del contrato pasa al comprador al momento de la entrega de la misma en el punto de origen, siendo ésta la interpretación uniforme que en armonía con la costumbre establecida por los comerciantes universalmente deben dar los tribunales a dicho contrato. *Northern Grain Warehouse Co.* v. *Northwestern Trading Co.*, 117 Wash. 422, 201 Pac. 903, 904. Bajo tal contrato no existe obligación de parte del vendedor de entregar la mercadería en el puerto de su destino, *National Wholesale Grocery Co.* v. *Mann*, 251 Mass. 238, 146 N. E. 791.

él fijados en dicha Orden, produciendo así una pérdida a los importadores—que el Secretario sabía que se iba a producir—en la venta de dichos arroces.

Es indudable que el Secretario confió en que, por la importancia del mercado local para los arroceros continentales, la restricción o cese total de las compras por los importadores puertorriqueños a los precios alzados de los molinos, habría de producir una regresión en el alza habida y éstos se verían precisados a reducir el precio de venta a los importadores "a niveles consistentes con transacciones ventajosas a los precios al por mayor fijados en la Orden", *Mora* v. *Mejías*, supra. Pero para que esa predicción del Secretario se convirtiera en una realidad tenía que suponer, como es natural, como factor correlativo imprescindible, que los importadores puertorriqueños dejaran de comprar arroz a los molinos a los precios del mercado continental a la fecha de los embarques, durante un período de tiempo suficiente para que pudiera hacerse sentir la pérdida del mercado puertorriqueño.([4]) Este factor a su vez significaba que los importadores puertorriqueños de arroz, en general. tendrían que abandonar esa parte de su actividad comercial o, de seguir en ella, vender, no ya sin una ganancia razonable sobre lo invertido y gastos de manejo y distribución—que es la norma general de la ley—sino a base de una pérdida de parte de la inversión misma hecha que le privaba de recobrar siquiera el costo pagado de su bolsillo (*out-of-pocket costs*). *Armour & Co.* v. *Bowles*, Em. App. 1945, 148 F.2d 529, cert. den. 325 U. S. 871, 89 L. Ed. 1989, rec. den. 326 U. S. 806, 90 L.Ed. 491. El Secretario, al buscar el impacto económico de su Orden en el mercado continental, estaba imponiendo a los importadores, como clase, en su negocio de importación y venta de arroz al por mayor, un gravamen directo que equivalía a un castigo económico por el alza de los molinos; alza que, aún siendo especulativa, no

---

([4]) De los autos surge que con posterioridad a la vigencia de la Orden 228, y a oportunidad ofrecida por varios molinos, se cancelaron órdenes por alrededor de 240,000 quintales de arroz.

era ilegal, y la cual los importadores no podían controlar una vez terminada la reglamentación federal, dada la aceptada "debilidad del poder de contratación de [su] parte."

El poder policial sobre la reglamentación de precios no alcanza a la regimentación total de los negocios, *People* v. *D'Esposito*, 45 N.Y.S.2d 865, (1944), y mucho menos a su destrucción, mediante la imposición de condiciones onerosas y detrimentales al negocio o industria en general. *Cf. Van Der Loo* v. *Porter*, Em. App. 1946, 160 F.2d 110, cert. den. 329 U. S. 774, 91 L.Ed. 665. No se trata aquí del caso individual de un miembro de una industria o negocio, que sufre pérdidas por causas ajenas al precio máximo en sí, siendo éste justo y equitativo para el negocio en general. Se trata de toda la clase, o totalidad de los individuos en una actividad comercial o negocio, que fueron sometidos, por necesario efecto de la Orden, a una pérdida—directa y conocida—de la inversión hecha en el negocio que, dentro del sistema prevaleciente de iniciativa privada, escogieron como su actividad. No obstante la acción previsora del Secretario en beneficio de los consumidores puertorriqueños al adoptar el sistema de precios fijos para el arroz, y no el de margen de beneficios a los importadores sobre el costo (*mark-ups*) en el mercado continental, según lo hacía antes la reglamentación federal, su poder y acción previsora no podían llegar, bajo la ley, hasta el extremo de producir pérdidas directas, sin resarcimiento, respecto a esas inversiones. *Van Der Loo* v. *Porter*, supra.

Teniendo presente el propósito del Secretario de que los consumidores puertorriqueños no sufrieran las consecuencias de la ambición especulativa de los arroceros continentales—y por lo breve del período exento de control—él pudo y debió proveer en la Orden el medio adecuado para que, aún sin conceder un margen de beneficios (*mark-up*) los importadores pudieran, por lo menos, recobrar el costo pagado de su bolsillo, *Armour & Co.* v. *Bowles*, supra. O bien pudo el Estado, en beneficio de los consumidores, absorber para sí la pérdida que,

por necesario efecto de la Orden con relación a los arroces comprados durante el período exento de control, se habría de producir a los importadores. El Secretario carecía de poder bajo la Ley 228 para otorgar a los consumidores subsidio de clase alguna a costa de los importadores. Pero, menos aún, si ese subsidio, como en este caso, era, no con cargo a las ganancias o beneficios de éstos, sino con cargo al propio capital invertido. Eso no es subsidio. Eso es confiscación.

Los hechos en este caso no justifican la aplicación de los principios que informan las decisiones en que principalmente basa su opinión el Tribunal. No se trata de precios que pudieran *a la larga* resultar muy bajos, y que, bajo la teoría del caso *Ben H. Rosenthal & Co.* v. *Porter*, Em. App. 1946, 158 F.2d 171, 173, y de los otros allí citados, reafirmada por la Corte de Apelaciones para el Primer Circuito en *Mora* v. *Mejías*, supra, en el sentido de que "La reglamentación sobre precios se fija no solamente a base de experiencia pasada, si que también a base de predicciones o anticipaciones razonables de futuras variaciones en el mercado. Si un reglamento de precios *es inicialmente válido sobre esta base dual,* el Administrador tiene derecho a observar los resultados de su funcionamiento durante un período razonable, antes de que un tribunal pueda llegar a la conclusión de que fué arbitraria o caprichosa su actuación *al no revisar los precios máximos fijados*", (bastardillas nuestras), requerirían un período de espera para que, observando su funcionamiento durante un lapso de tiempo razonable, pudieran ser revisados. Se trata escuetamente de inversiones hechas en un período exento de control federal y local y de una pérdida de parte de esa inversión producida por precios fijados por debajo del costo. Se trata, ciertamente, y en cuanto al arroz comprado en ese período, de un precio irrazonable y arbitrario porque, si bien es verdad como dice la Corte de Apelaciones en el citado caso de *Mora* v. *Mejías*, que "No se niega [por los importadores] que los precios máximos establecidos en la Orden Administrativa

228 eran válidos aplicados a existencias de arroz en Puerto Rico que habían sido compradas en los Estados Unidos continentales mientras los precios de los molinos estaban aún sujetos a la reglamentación federal", resulta igualmente cierto, bajo el mismo principio, que los precios eran, desde su origen, inválidos, aplicados a existencias de arroz en Puerto Rico, o en tránsito, que habían sido compradas en el continente en el período exento de control federal y antes de empezar a regir la Orden 228, a precios más altos que los fijados en ésta.

El principio de que ninguna persona será privada de su propiedad sin el debido proceso de ley no es incompatible con el igualmente esencial principio de que toda propiedad se adquiere y se posee bajo la obligación implícita de que su uso o disposición no sea perjudicial al interés general de la comunidad, *Mugler* v. *Kansas*, 123 U. S. 623, 31 L.Ed. 205. Pero el ejercicio del poder de reglamentar precios no incluye la autoridad para derogar, por *fíat* administrativo, la garantía constitucional contra la privación de la propiedad sin el debido proceso de ley. El ejercicio válido del poder policial de reglamentación de precios está sujeto a normas consistentes con esa garantía. Por eso la ley exige que el precio sea "generalmente justo y equitativo". Esa norma no envuelve un concepto etéreo, y por lo tanto no puede aplicarse en el vacío. Está ligada a la realidad misma de la situación y desarrollo de la industria o negocio en general. Y si bien, en el ejercicio de ese poder y bajo esa norma, el Estado no garantiza una ganancia a cada productor individualmente, *Bowles* v. *Willingham*, 321 U. S. 503, 88 L.Ed. 892; *Counselman* v. *Fleming*, Em. App. 1947, 161 F.2d 203, cert. den. 331 U. S. 861, 91 L.Ed. 1867; *Chippewa County Co-Op Dairy* v. *Clark*, Em. App. 1947, 163 F.2d 753; *Weisel & Co., Inc.* v. *Bowles*, Em. App. 1946, 156 F.2d 1007; *Vanlandingham* v. *Clark*, Em. App. 1947, 163 F.2d 896; *Ben H. Rosenthal & Co.* v. *Porter*, supra; *Birtcherd Dairy* v. *Bowles*, Em. App. 1946, 156 F.2d 1004, no se debe perder de vista que la ley persigue,

no sólo la protección de los consumidores, sino también la protección de aquellas personas dedicadas al comercio. *White Trimming House* v. *Porter*, Em. App. 1946, 154 F.2d 113; *Philadelphia Coke Co.* v. *Bowles*, Em. App. 1943, 139 F.2d 349, 355. El control de precios va dirigido a evitar el injustificado aumento en el precio de los artículos básicos, las prácticas especulativas y la inflación, para proteger la economía contra un desajuste o colapso total.

No entra en juego en este caso el principio de que cuando una industria está sujeta a fluctuaciones estacionales en relación con su renglón más importante, la razonabilidad del precio máximo establecido debe mirarse con relación al ciclo completo de fluctuaciones y no solamente con relación al período del ciclo en que los costos fueron más altos. *Counselman* v. *Fleming*, supra. Aquí no estamos frente a un control local de precios en el nivel de *producción*, y sí en su nivel de venta y distribución, afectados éstos a su vez por el costo original a precios fuera del control local; y el ciclo completo en el continente para poder aplicar dicho principio estaría representado por la cosecha anual de arroz. Es precisamente la cosecha de 1952–53 la que, primero, estuvo sujeta al control federal y luego libre de éste. El ciclo, pues, de haberlo, comprende esa cosecha, y es con relación a los arroces provenientes de la misma que se causó, por efecto inicial de la Orden 228, la pérdida en la inversión hecha por los importadores puertorriqueños.

El Secretario pudo y debió—porque estaba en mejor posición que los importadores para hacerlo—anticipar que como consecuencia de la inundación del mercado puertorriqueño con arroces de la cosecha de 1953–54 de los estados del Sur principalmente, los importadores no sólo sufrirían la pérdida ocasionada por el precio máximo fijado en la Orden con relación al arroz comprado en época exenta de controles, sino una probablemente mayor al no poder venderlo aún a dicho precio máximo.

Las disposiciones de la Ley Federal de Emergencia de Guerra, 1942, se ha dicho, están influídas por el amplio objetivo del estatuto, pero no puede usarse el argumento de la presión inflacionaria en el control de precios para dar a las mismas un significado distinto de aquél que el lenguaje contenido en el texto de la historia legislativa de cada sección, informa. *Thomas Paper Stock Co.* v. *Porter*, 328 U. S. 50, (1946), 90 L.Ed 1078. La ley no fué aprobada para perjudicar o penalizar los negocios legítimos, sino más bien para proteger al público, en tiempos de emergencia, "contra la avaricia de la incontrolable naturaleza humana". *Alpert* v. *Greenlee*, 148 P.2d 777, (1944). Es razonable pensar que el Secretario, al establecer en su Orden bajo el sistema de precios fijos, los precios máximos para las ventas de arroz en Puerto Rico equivalentes a aquéllos que se fijaban y autorizaban bajo el sistema de beneficios sobre el costo (*mark-ups*) por la reglamentación federal, estimó que el precio fijado en esta última a los molinos era índice de que en el mismo estaba incluída una ganancia razonable. Pero como la Orden 228 no podía surtir efecto legal en el continente, y no había control federal, la etapa inicial de la venta por los molinos quedó sujeta al alza que en el mercado libre se pudiese operar y al efecto económico en los molinos de la merma del mercado puertorriqueño —efecto que quizá pudo haberse anticipado si el control local hubiera entrado en vigor en el instante mismo del cese del control federal—y habiendo los importadores puertorriqueños comprado ya arroz en el período exento de control, a precios de ese mercado libre que eran más altos que los fijados en la Orden, sin que ésta proveyera medio alguno para los importadores resarcirse siquiera del costo pagado de su bolsillo (*out of pocket costs*), *Armour & Co.* v. *Bowles*, supra, dicha Orden, aplicada a los peticionarios en cuanto a esa propiedad, es arbitraria e irrazonable.

El tribunal penaliza a los importadores porque ellos contrataron con los molinos, en agosto y septiembre de 1952,

para comprar a precio abierto en el mercado "frente a los prospectivos controles locales", y porque los riesgos de alza en el precio una vez cesado el control federal "fueron deliberadamente asumidos" por los importadores. Si la conclusión del Secretario sobre "la debilidad del poder de contratación de parte de los importadores puertorriqueños" es correcta, no creo adecuada la anterior premisa ni justa su aplicación. El Secretario estaba en mejor posición que los importadores para, en su rol de "buen profeta", tomar oportunamente aquellas medidas que habrían de asegurar la estabilidad necesaria en las relaciones comerciales entre Puerto Rico y el continente, en bien de los consumidores. Él pudo anticipar su Orden para que sirviera de advertencia a los molinos, si no en cuanto a sus consecuencias legales, sí en cuanto a sus consecuencias económicas por efecto de la merma del mercado local.

Esta opinión no se basa en la subordinación del poder policial sobre control de precios, a los contratos existentes, (⁵) sino en una situación de hechos consumada ya, y conocida por el Secretario, cuando promulgó la Orden. El Estado no puede hacer indirectamente, en el ejercicio de su poder sobre reglamentación de precios, lo que no podría hacer directamente en el ejercicio de sus demás poderes soberanos. No hay precepto constitucional alguno, ni principio alguno de democracia, que le faculte, a través del ejercicio de ese poder, a transferir propiedad de un grupo de ciudadanos, aquí llamados importadores, a otro grupo de ciudadanos, aquí llama-

---

(⁵) Bajo la teoría de esta opinión, es innecesario considerar aquí si los contratos celebrados entre los molinos y los importadores quedaron o no, en cuanto a éstos, afectados válidamente por el efecto de la Orden 228 y subordinados a la política pública que la misma puso en vigor. *Brewing Corporation of America* v. *Cleveland Trust Co.*, 185 F.2d 482, (C. A. 6, 1950) ; *Cobleigh* v. *Woods*, 172 F.2d 167, cert. den. 337 U. S. 924, 93 L. Ed. 1732; *Seminol Rock & Sand Co.* v. *Fleming,* Em. App. 1947, 160 F.2d 542; *Philadelphia Coke Co.* v. *Bowles,* supra; y si la cláusula de que venían obligados a comprar al precio abierto del mercado a la fecha de entrega en el puerto de origen, estableció o no inmunidad contra el poder policial del Estado para controlar los precios de acuerdo con la Ley 228.

dos consumidores, bajo condiciones que equivalen a una confiscación ilegal de la misma; menos aún por el medio coercitivo de la ley, de privación de su libertad; y menos aún si esa libertad va a depender del grado de certeza en las profecías de un funcionario público.

Como dije antes, las consecuencias legales inmediatas del presente recurso están limitadas a sus efectos en los procesos criminales pendientes en el Tribunal Superior. Es mi opinión que, para que puedan recaer convicciones válidas en dichos procesos, el Estado viene obligado a alegar y probar que la venta específica que como violación a la Orden 228 se imputa en cada caso, no se hizo del arroz comprado durante el período exento de control federal y local. La excepción que dicha Orden—para que hubiera sido válida desde su origen en su total aplicación a los importadores—debió haber contenido en cuanto a dicho arroz, debe considerarse parte de la Orden y de la definición del delito por cuya comisión se acusa, y, en consecuencia, alegarse y probarse por el Estado que la infracción imputada no cae dentro de la excepción. Esa es la regla de ley aplicable, bajo la teoría de esta opinión.

La Orden 228, de hecho, impedía a los peticionarios, según he expresado antes, resarcirse de los costos pagados. Por haber intentado recobrar lo que era suyo—y no por espíritu de especulación agiotista—se les ha perseguido. Pagado ya por ellos a los molinos el precio alzado de la época de no control, los importadores puertorriqueños no deben pagar también, al sobreprecio de su libertad personal, las prácticas especulativas de los arroceros continentales ni la tardanza del Estado al intentar moderarlas con el impacto económico indirecto de la Orden 228.